STATE OF CONNECTICUT *v.* VINCENT STELLATO
(4092)
DUPONT, C. J., HULL and SPALLONE, Js.

Argued January 15—decision released April 14, 1987

*Robert M. Casale,* for the appellant (defendant).

*Christopher Malany,* deputy assistant state's attorney, with whom, on the brief, were *Mary Galvin,* assistant state's attorney, and *Cheryl M. Petrucci,* legal intern, for the appellee (state).

HULL, J. The defendant was convicted of conspiracy to commit larceny in the first degree, in violation of General Statutes §§ 53a-48 and 53a-122 (a) (2), con-

spiracy to commit burglary in the third degree, in violation of General Statutes §§ 53a-48 and 53a-103, and larceny in the first degree, in violation of General Statutes §§ 53a-119 and 53a-122 (a) (2). The defendant appeals from the judgment of conviction, claiming that the trial court erred (1) in denying his motion for judgment of acquittal on the first and second counts of the information in that the evidence presented at trial was insufficient to prove guilt beyond a reasonable doubt, (2) in ordering him to make a $10,000 charitable contribution as part of his sentence, and (3) in denying the portion of his motion for judgment of acquittal which asserted that the defendant was improperly charged with two counts of conspiracy arising out of a single agreement.

The jury could reasonably have found the following facts. On the evening of October 2, 1980, between 6 and 10 p.m., over 250,000 gallons of home heating oil, worth over $200,000, were stolen from the Wyatt Company oil terminal in Hamden. It was transported in tanker trucks to storage facilities at Bello and Sons I.D. Systems in West Haven.

Planning of the oil theft began many months before its commission. The conspiracy began when Mike Raucci, a former employee of Wyatt Oil, approached James McVeigh[1] and asked him if he knew of anyone who wanted "to do" a large amount of oil. Raucci showed McVeigh a set of keys to the Wyatt Company terminal tanks, yard and security system. McVeigh stated that the defendant might be of some assistance in the matter. McVeigh then "discussed it" with the defendant. The defendant agreed with McVeigh that

---

[1] James McVeigh admitted his coconspiracy in the burglary and larceny. He testified for the state about the planning and commission of the oil theft. McVeigh and Charles DeMusis were business partners in P.T. Meter, a meter repair company that did most of its business with the oil company. McVeigh was also involved in other related businesses.

Ralph "Rocky" Bello, who had also been in the oil business for a number of years, would have the necessary cash and storage facilities.

The defendant proceeded to act as intermediary between Raucci, McVeigh and Bello in determining the price to be paid for the stolen oil. The four finally decided that Bello would pay fifty cents per gallon of oil, some thirty cents per gallon below market price.

The group's discussions then turned to the problem of transporting the oil. The defendant suggested to Bello that a trucking firm might be willing to haul the oil. It was decided that, in order to avoid detection, the burglary would be scheduled for October 2, 1980, the evening the Ali-Forman prizefight was scheduled to be telecast at the New Haven Coliseum. The group anticipated that many local residents would watch the screening. A detailed map was drawn up with alternate truck routes, designed to avoid suspicion caused by increased truck traffic.

A witness, James Schwartz,[2] saw the defendant, Bello and McVeigh, in the yard at Bello's business some weeks before the theft. Bello approached Schwartz and asked him how many trucks could be "off-loaded" in the yard at one time. A few days before the theft, Schwartz again saw the defendant, Bello and McVeigh in Bello's yard.

During the day of October 2, 1980, prior to the theft, the defendant was with Bello in the West Haven yard. The defendant had advised Bello to replace the Jenkins valves in the oil unloading area with check valves, which would permit oil to be unloaded "a lot quicker." The two approached Raymond Bruneau, an employee of

---

[2] James Schwartz was employed by Farnham Environmental Control from November, 1978, until some time after the theft. Farnham Environmental was located next to Bello and Sons I.D. Systems.

Farnham Environmental, who maintained pipes and fittings. Bruneau was asked about the possibility of replacing the valves.

The defendant returned to Bello's oil terminal that evening, before the theft began. In accordance with the plan, the defendant remained in Bello's yard when the first trucks arrived with the stolen oil. McVeigh observed the defendant "trying to get [the trucks] unloaded as fast as they could get unloaded." McVeigh stated that the defendant "was supervising the unloading."

Another witness, a truck driver named George Carranzo, saw the defendant in Bello's yard when he returned with his first load. He stated that the defendant was "the one that, in my opinion, was supervising me, telling me what had to be done to unload the truck." When defense counsel suggested on cross-examination that the defendant was in Bello's yard only to repair a pump, Carranzo responded, "I don't remember him repairing . . . . He was unloading the trucks. . . . That's what he was there for." Carranzo made three trips hauling oil from Wyatt to Bello's. By the third trip, he was suspicious of activities because "there were just too many trucks."

Another witness, James Galla, was also shuttling stolen oil between Wyatt and Bello's yard. During the evening, he observed the defendant standing on the dike in Bello's yard, monitoring the pumps transferring oil from the trucks to Bello's tanks. By night's end, Galla too was suspicious of the activities. "I thought something was up. Everybody was doing things quicker than usual."

McVeigh and Raucci kept pumping oil from the Wyatt terminal into trucks until 10 p.m. After they "closed up" the operation, McVeigh went to Bello's office with the oil meter tickets. While McVeigh sorted

tickets, the defendant entered and had coffee with the two. Bello handed McVeigh an envelope with between $13,000 and $18,000 cash in it; less than full payment for the stolen oil.

On or about October 3, Bello gave the defendant additional cash in an envelope to pay McVeigh and Raucci for the stolen oil. Sometime after October 3, three checks for a total of $20,000 were drawn on the account of Rocky Bello and Sons. The three checks were made out to the defendant and signed by Rocky Bello. Shortly after the theft, McVeigh sent the defendant $5000 more in cash.

## I

The defendant's first claim is that the court erred in denying his motion for judgment of acquittal on the first and second counts of the information.[3] The defendant in effect asserts that while the evidence presented at trial may be sufficient to support his conviction on a third count of the information for the substantive crime of larceny in the first degree, such evidence is insufficient to support his convictions for conspiracy to commit larceny and conspiracy to commit burglary. We disagree.

[3] The first count of the information provided: "Vincent Stellato, acting with intent that conduct constituting a crime be performed, did agree with one or more persons, namely Ralph R. Bello, James McVeigh, Donald Mongillo and Jack Flagge, to engage in or cause the peformance of the crime of Larceny in the First Degree (53a-122 (a) (2)), and any one of them did commit an overt act in pursuance of such conspiracy, in violation of Section 53a-48 of the General Statutes."

The second count provided: "And the Attorney aforesaid further accuses Vincent Stellato of Conspiracy and charges that at the city of West Haven, on October 2, 1980, the said Vincent Stellato, acting with intent that conduct constituting a crime be performed, did agree with one or more persons, namely Ralph R. Bello, James McVeigh, Donald Mongillo and Jack Flagge to engage in or cause the performance of the crime of Burglary in the Third Degree (Sec. 53a-103), and any one of them did commit an overt act in pursuance of such conspiracy, in violation of Section 53a-48 of the General Statutes."

General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

"[T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt 'does not require a court to "ask itself whether *it* believes that the evidence . . . established guilt beyond a reasonable doubt." ' (Emphasis in original.) (Citation omitted.) *Jackson* v. *Virginia,* [443 U.S. 307, 318–19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)] 'Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)]. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the extent necesssary to guarantee the fundamental protection of due process of law.' (Emphasis in original.) (Footnotes omitted.) *Jackson* v. *Virginia,* supra, 319." *State* v. *Scielzo,* 190 Conn. 191, 197–98, 460 A.2d 951 (1983).

The defendant asserts specifically that the state failed to prove the existence of an agreement, a necessary element in the crime of conspiracy. Our courts have stated that " '[t]he existence of a formal agreement

between the parties need not be proved; it is sufficient to show that they are "knowingly engaged in a mutual plan to do a forbidden act." ' " *State* v. *Vessichio,* 197 Conn. 644, 656, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986); *State* v. *Holmes,* 160 Conn. 140, 149, 274 A.2d 153 (1970). It is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words "we have an agreement." We conclude that, from the testimony presented in the trial court, the state did meet its burden of providing evidence from which a jury could conclude that the defendant was "knowingly engaged in a mutual plan to do a forbidden act."

The defendant also challenges the existence of the specific intent necessary for a conviction for conspiracy under General Statutes § 53a-48. The state provided ample circumstantial evidence from which a reasonable jury could infer that the defendant intended to conspire to steal the Wyatt oil. The defendant's claim on appeal must fail. Conviction for conspiracy can be based on circumstantial evidence, for conspiracies, by their very nature, are formed in secret and only rarely can be proved other than by circumstantial evidence. *State* v. *Vessichio,* supra, *State* v. *Holmes,* supra, 150. Likewise, intent is rarely susceptible of proof by direct evidence. *State* v. *Morrill,* 193 Conn. 602, 609, 478 A.2d 994 (1984).

The state provided sufficient evidence to support a reasonable inference that the defendant intended to commit the crimes with which he was charged. "A person's intention is to be inferred from his conduct." *State* v. *Sober,* 166 Conn. 81, 93, 347 A.2d 61 (1974). The defendant conducted himself like a conspirator. He engaged in negotiations to sell over 250,000 gallons of home heating oil at fifty cents per gallon, when the market rate was eighty cents per gallon. There was testi-

mony that the defendant acted as a price negotiator, as an unloading supervisor, and as a cash distributor. The defendant was in fact a key figure in the conspiracy.

Where there is sufficient evidence to support a reasonable inference that the defendant intended to commit the crimes charged, whether such inference should be drawn is properly a question for the jury to decide. *State* v. *Morrill,* 193 Conn. 602, 609, 478 A.2d 994 (1984). *State* v. *Sober,* supra, 92–93. From the defendant's conduct prior to, during, and after the theft, a reasonable jury could easily infer that he conspired to commit the theft of the oil.

We agree with the defendant that mere presence at the scene of the crime, even coupled with the knowledge that a crime was being committed there, is not sufficient to establish guilt of a conspiracy. See *State* v. *Vessichio,* supra, 656–57; *United States* v. *Soto,* 716 F.2d 989, 991 (2d Cir. 1983); see also *United States* v. *Johnson,* 513 F.2d 819 (2d Cir. 1975). Evidence tending to show knowing participation in a conspiracy is also needed. The defendant in this case was not "merely present" at the scene. The defendant was an active participant in the oil theft. The defendant's help in "getting the trucks rolling," his supervision of the rapid unloading, and his other activities the night of the theft are indicative of his knowing participation in the Wyatt oil conspiracy.

There was sufficient evidence adduced at trial to permit the jury to find the defendant guilty beyond a reasonable doubt of conspiracy to commit burglary and larceny. There was testimony that the defendant was an active participant in every phase of the planning and commission of the crimes. Evidence was presented to the effect that months before the theft, the defendant agreed to act on behalf of McVeigh and Raucci to find

someone willing to buy and able to store the large quantity of oil they planned to take from Wyatt. Testimony was introduced that the defendant assisted in solving the logistical problems surrounding the theft and resale, that the defendant supervised the unloading of the stolen oil, that the defendant was present when McVeigh sorted out the meter tickets and made an accounting of the oil stolen and resold, and that the defendant received payment for his services.

Viewed in its entirety, there was sufficient evidence produced at trial to establish all the necessary elements for the conspiracy convictions under General Statutes § 53a-48.

## II

The defendant's second claim is that the $10,000 charitable contribution imposed by the court was unlawful. The total effective sentence imposed by the court was not less than four nor more than eight years incarceration. In addition, the court ordered the defendant to make a charitable contribution in the amount of $10,000.

At the presentence hearing, the prosecution, the defense and the court agreed that a $10,000 fine or penalty would be appropriate. The defendant suggested a specific charitable organization to be the recipient of the $10,000. At sentencing, the defendant did not claim that the court was not authorized to impose a charitable contribution as part of his sentence. Nor did the defendant make a motion to correct the sentence under Practice Book § 935.

The defendant failed to preserve his claim for review in a proper manner. *State* v. *Waterman*, 7 Conn. App. 326, 352, 509 A.2d 518, cert. denied, 200 Conn. 807, 512 A.2d 231 (1986). Further, it is a well established principle that " 'error induced by an appellant cannot

be grounds for reversal and will not be reviewed.' " *State* v. *Silveira,* 198 Conn. 454, 467, 503 A.2d 599 (1986); *State* v. *Ross,* 189 Conn. 42, 47, 454 A.2d 266 (1983). We therefore will not consider this claim.

## III

The defendant's third claim is that the court erred in charging the jury on, and in rendering judgment of conviction for, both counts of conspiracy. The state concedes that the defendant's dual conspiracy convictions are duplicitous. We agree.

In *State* v. *Kitt,* 8 Conn. App. 478, 513 A.2d 731 (1986), we held: " 'Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.' " Id., 489, quoting *Braverman* v. *United States,* 317 U.S. 49, 53, 63 S. Ct. 99, 87 L. Ed. 23 (1942). The court was therefore in error in rendering judgment and sentencing on two conspiracies. General Statutes § 53a-51 provides in relevant part: "Conspiracy [is a crime] of the same grade and degree as the most serious offense which is . . . an object of the conspiracy . . . ." Therefore, if the evidence justifies charging the jury that the defendant may be guilty of conspiracy to commit more than one crime, the court should instruct on all of the separate counts which charge conspiracy. If the jury returns guilty verdicts on more than one count the court should render judgment and sentence on only one. *State* v. *Kitt,* supra, 490; accord *Ball* v. *United States,* 470 U.S. 856, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985). Pursuant to General Statutes § 53a-51, the court should render judgment and sentence on conspiracy to commit the greater offense. If the crimes of conspiracy of which the jury

finds the defendant guilty are of equal severity, the court must use its discretion to render judgment and sentence on only one of them. See *State* v. *Kitt,* supra.

There is error in part, the judgment convicting the defendant of conspiracy to commit burglary in the third degree is set aside and the case is remanded with direction to render judgment that the defendant is not guilty of that crime.

In this opinion the other judges concurred.