STATE OF CONNECTICUT *v.* FRANKIE ESTRADA
(10304)

DUPONT, C. J., NORCOTT and LAVERY, Js.

Argued April 28—decision released July 28, 1992

*James J. Ruane,* with whom was *Michael A. Fitzpatrick,* for the appellant (defendant).

*Frederick W. Fawcett,* assistant state's attorney, with whom, on the brief, was *Donald A. Browne,* state's attorney, and *Jonathan C. Benedict,* assistant state's attorney, for the appellee (state).

NORCOTT, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-54a and 53a-48.[1] He was sentenced to

---

[1] The defendant was acquitted of the charge of murder in violation of General Statutes § 53a-54a (a).

a term of twenty years imprisonment to run concurrent with other sentences that had been imposed previously for a total effective sentence of twenty years.

On appeal, the defendant raises the following issues, which he claims are the basis for a judgment of acquittal: (1) whether a certain threatening statement made by a coconspirator against the victim of a murder was competent evidence; (2) whether the trial court's instructions improperly removed the evidence of the threat from the jury's consideration under the conspiracy count; (3) whether the evidence was sufficient to find the defendant guilty of conspiracy; (4) whether the evidence of a coconspirator's shooting of a third person was relevant and nonprejudicial; and (5) whether the state improperly expanded the conspiracy count beyond the information and bill of particulars. We conclude that there was insufficient evidence to find the defendant guilty of conspiracy to commit murder, even if the statement of the coconspirator is competent evidence. Accordingly, a judgment of acquittal must result.[2]

The jury could reasonably have found the following facts. In the early morning of April 23, 1990, Jeremy Jacobs, Christopher Adams, Michael Adams, Christopher Smith, Tyrone Holman and others were leaving the Marquess Lounge at the northwest corner of Main Street and Railroad Avenue in Bridgeport. As they came out of the lounge, they were shot at from the direction of elevated railroad tracks that ran next to the lounge parking lot. Jacobs was hit and subsequently died from his wounds. Another patron, Julie Hanks, suffered a foot wound. The shooting lasted for between twenty seconds and three minutes.

[2] Because we find that the defendant's third claim of error is dispositive of this appeal, we need not reach the other issues he has briefed.

After the gunfire stopped, the victim's brother carried him to Park City Hospital. Others from the lounge followed. While at the hospital, Holman saw a van drive by. He identified it as the same van in which he had seen the defendant on the previous day. Bridgeport police officers Juan Gonzalez and Ernest Garcia went to the hospital to control the crowd. On the basis of information gathered there, these officers drove from the hospital to the P.T. Barnum housing complex, which the defendant was reported to frequent. While en route, the officers saw a van driven by the defendant, who was recognized by Gonzalez. Without being hailed by the police, the van pulled over on Pine Street, where the police ordered the occupants out of the vehicle. The defendant, Luis Colon and Joseph "Dinky" Diaz got out of the van and subsequently were taken to police headquarters. Later that day, John Buturla of the state police lifted four footwear impressions from the top of the impounded van. Thereafter, the police seized the three men's footwear. Kenneth Zercie of the state police forensic laboratory testified that one of the footprints matched that of footwear seized from Colon.

At the time of the shooting, Tyrone Smith was one of the individuals in the parking lot who saw two shooters, both of whom were wearing two-toned hooded sweatshirts. One was taller than the other. Smith knew that neither of the two people was the defendant. Before the shooting, he had been outside the Marquess Lounge on Railroad Avenue, talking with Rolando Pierce. While standing there, Smith saw a yellow-brown van with stripes slowly cruise past the lounge. Smith could not identify the driver, but described him as "big" with a "hairy face" and "mean looking." Smith had seen the defendant and, on another occasion, another Hispanic male drive this same vehicle.

John Morey also testified that he saw the van Smith described shortly after the shooting, between 1 and 1:30

a.m., at the P.T. Barnum complex, which is a few minutes away from the Marquess Lounge. Morey's sighting of the van occurred prior to the encounter with the police on Pine Street. At the housing complex, the van was being driven by a stocky Hispanic male known as "T" who "came from New York." Morey did not see the defendant in the van when the vehicle reached the complex, but he claimed to have seen him later near some of the housing units after the van left the housing complex.

Although no one who was at the lounge could identify the person or persons who did the shooting, everyone agreed that the gunfire originated from the area of the railroad tracks. Detective Richard Herlihy investigated the area of the tracks and found no steps or ladders that would provide access to them. He reached the tracks by first walking up an embankment about 200 feet east of the area from which the shots were reported to have come, and then by walking west, back toward the lounge. On the tracks, Herlihy found twenty shell casings of the same caliber within a fifteen foot radius. No weapon was introduced into evidence at the trial.

According to Edward McPhillips, a state firearms examiner, five of the casings Herlihy found matched one of numerous shell casings found by police officer David Kalagian at the scene of a separate incident in which Ronald Dunbar had been shot five times by a person he later identified as Colon on April 19, 1990, near an apartment in the P.T. Barnum complex.[3] Dunbar identified his assailant's gun as "big," stating that it "looked like a rifle."

Finally, a state's witness, Teisha Edmonds, who was the victim's girl friend at the time he was shot, testi-

---

[3] It was McPhillips' opinion that five of the shell casings found by Herlihy and one found by Kalagian were fired from the same weapon.

fied that on April 16, 1990, she was confronted by Joseph Diaz, who told her, "When you see your nigger, tell him I'm going to get him; he's going to die." It is clear that the defendant was not present when Diaz made this statement. It is against this factual backdrop that we measure the defendant's claim that there was insufficient evidence on which to sustain a conviction of conspiracy to commit murder.

At the outset, we note that "[o]ur review is conducted without regard to the credibility of the witnesses. *State* v. *Robinson,* 213 Conn. 243, 256, 567 A.2d 1173 (1989)." *State* v. *Lynch,* 21 Conn. App. 386, 392, 574 A.2d 230, cert. denied, 216 Conn. 806, 580 A.2d 63 (1990). "When reviewing a claim of evidentiary sufficiency, we employ a two part test. We first review the evidence presented at trial, construing it in the light most favorable to sustaining the jury's verdict. Next, we determine whether, on the facts so construed and the inferences reasonably drawn therefrom, the jury could have concluded that the cumulative force of the evidence established the defendant's guilt beyond a reasonable doubt. . . . In determining if the jury reasonably could have found the defendant guilty, we ask if any rational factfinder could have done so." (Citations omitted.) *State* v. *Channer,* 28 Conn. App. 161, 164, 612 A.2d 95 (1992).

" 'To establish the crime of conspiracy under § 53a-48 of the General Statutes, the state must show that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators.' *State* v. *Vessichio,* [197 Conn. 644, 656, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986)]; *State* v. *DeMatteo,* 186 Conn. 696, 707, 443 A.2d 915 (1982); *State* v. *Smith,* 15 Conn. App. 122, 125, 543 A.2d 301, [cert. denied, 209 Conn. 805, 548 A.2d 441] (1988). 'The existence of a formal agreement

between the parties need not be proved; it is sufficient to show that they are "knowingly engaged in a mutual plan to do a forbidden act." *State* v. *Holmes,* 165 Conn. 140, 149, 274 A.2d 153 [1970].' *State* v. *Ortiz,* 169 Conn. 642, 645, 363 A.2d 1091 (1975); *State* v. *Smith,* supra. Because of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. *State* v. *Vessichio,* supra, 656; *State* v. *Smith,* supra, 126." *State* v. *Lynch,* supra. Moreover, it is well settled that conspiracy is a specific intent crime, with the intent divided into two parts: (1) the intent to agree to conspire; and (2) the intent to commit the offense that is the object of the conspiracy. *State* v. *Beccia,* 199 Conn. 1, 3–4, 505 A.2d 683 (1986). "To sustain a conviction for conspiracy to commit a particular offense, the prosecution must show not only that the conspirators intended to agree but also they intended to commit the elements of the offense." (Internal quotation marks omitted.) *State* v. *Boykin,* 27 Conn. App. 558, 567, 609 A.2d 242 (1992), quoting *State* v. *Beccia,* supra.

At trial, the state relied on certain evidence to establish the existence of the defendant's role in a conspiracy. The keystone to this evidentiary framework was the defendant's presence in the van with Colon and Diaz a short time after the shooting at the lounge. To establish the defendant's guilt on the conspiracy charge, the state necessarily asked the jury to draw certain inferences, including inferences (1) that Colon and Diaz were the shooters based on Diaz' statement to Edmonds regarding Jacobs' death, on Colon's connection to the Dunbar shooting by virtue of the similar shell casings, and on Colon's footprint on top of the van, and (2) that the defendant, who was identified as resembling a person who drove a van similar to the one in which he was later apprehended with Colon and Diaz, drove the van to "scout" the Marquess Lounge and then transported the shooters to the scene of the

ambush. From this, the jury was required to infer further that the defendant intended to make an agreement with Colon and Diaz to carry out the shooting.

Although Connecticut law accepts the practice of allowing inferences based on other inferences; *State* v. *Gonski,* 155 Conn. 463, 468, 232 A.2d 483 (1987); the stacking of reasonable inferences the jury was required to draw was built on a weak foundation that failed to establish any semblance of the defendant's participation in an agreement to engage in a conspiracy. It is axiomatic that the jury as factfinder determines if any reasonable inference in a particular case should be drawn. The jury accomplishes this function, however, only where there exists sufficient evidence to support reasonable inferences. *State* v. *Williams,* 202 Conn. 349, 356–57, 521 A.2d 150 (1987); see also *State* v. *Boykin,* supra, 568.

In this case, sufficient evidence permitting such inferences is lacking. The facts presented did not permit the jury reasonably and logically to infer that the defendant agreed to engage in the criminal activity that was the object of the alleged conspiracy. No shooters were ever actually identified, no weapon was ever found, and a very short time after the shootings, Colon and Diaz tested negative for gunpowder residue on their hands. Further, no evidence was ever introduced connecting the defendant to ownership or registration of the yellow-brown van, and the only noncircumstantial connection between the defendant, Colon and Diaz was their presence together in the van after the shooting. Even if the defendant had been at the scene and had knowledge of the crime, this would still be insufficient to establish guilt of a conspiracy. See *State* v. *Lynch,* supra; *State* v. *Stellato,* 10 Conn. App. 447, 454, 523 A.2d 1345 (1987). The facts presented did not permit the jury reasonably and logically to infer that the defendant intended to engage in the criminal activity that was

the object of the alleged conspiracy; such a link is too far attenuated. Therefore, on the basis of our careful review of the entire record, we conclude, as a matter of law, that there was insufficient evidence from which the jury could have drawn reasonable inferences leading to the defendant's conviction on the conspiracy charge.

Our examination of other decisions in which our appellate courts have reviewed claims of evidentiary insufficiency in the context of conspiracy convictions discloses that much more is required than exists in this case. For example, in *State* v. *Vessichio,* supra, a significant issue on appeal was the admission of damaging statements by a coconspirator confirming the defendant's involvement in illegal cocaine transactions. In sustaining the trial court's finding that the evidence of the defendant's participation in the conspiracy to sell cocaine, while not "overwhelming"; id., 657; was sufficient, our Supreme Court reviewed the following evidence: observation of narcotics transactions conducted from the defendant's van on three occasions; the positive identification of the defendant as the driver of the van; the observation of the defendant who cruised the neighborhood of a cocaine sale involving an undercover police officer before the drug transaction and the defendant's act of picking up the coconspirators involved in the sale immediately after the crime.

In *State* v. *Warren,* 14 Conn. App. 688, 544 A.2d 209 (1988), cert. denied, 488 U.S. 1030, 109 S. Ct. 839, 102 L. Ed. 2d 971 (1989), in which this court held that evidence of the defendant's activities and participation in a barroom sexual assault was sufficient to sustain his conviction for conspiracy, the defendant was clearly present in the poolroom where the victim was assaulted by a group of men. Further, the defendant blocked the door to prevent the victim's escape and announced that

he would act as "the doorman" while others raped the woman. The victim also identified the defendant as one of the men who raped her.

Finally, in *State* v. *Cavanaugh,* 23 Conn. App. 667, 583 A.2d 1311 (1990), cert. denied, 220 Conn. 930, 598 A.2d 1100 (1991), we again required that there be a substantial degree of evidence of the conspiracy to overcome the claim of insufficiency. In that case, the defendant and an accomplice were involved in a drug purchase by an undercover police officer. The defendant's accomplice told the officer she could get drugs from the defendant, whom the accomplice pointed out. This was followed by an exchange of cocaine for money, which the accomplice then took to the defendant. All of this was seen by the police. This court therefore concluded that the jury could reasonably and logically have inferred that the defendant and his accomplice had agreed to work in concert to commit the crime of selling narcotics.

In this case, however, the strength of the factual situation pales in comparison with those in the cases cited. As stated earlier, although a jury may base reasonable inferences on other reasonable inferences, successive inferences must be justified by the facts of the particular case. *State* v. *Carter,* 196 Conn. 36, 45, 490 A.2d 1000 (1985). The evidentiary scenario here does not lend itself to an accumulation of inferences that leads to the reasonable and logical conclusion that the defendant had the intent to agree to conspire to commit the crime charged by the state.

We acknowledge the all too frequent incidences of gunplay in our city streets and find them to be both lamentable and deplorable; often these situations are the product of clear conspiratorial design. The crime of conspiracy, however, must be established by a sufficient quantum of evidence which, in this case, is absent.

The judgment of conviction of conspiracy to commit murder is reversed, and the case is remanded with direction to render judgment of acquittal.

In this opinion the other judges concurred.