STATE OF CONNECTICUT *v.* GERALDO ROSADO
(AC 33523)

Bear, Espinosa and Dupont, Js.

Argued November 17, 2011—officially released April 3, 2012

*Charles F. Willson*, special public defender, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Gary Nicholson*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Geraldo Rosado, appeals from the judgment of conviction, rendered after a jury trial, of conspiracy to commit murder in violation of General Statutes §§ 53a-48 and 53a-54a. On appeal, the defendant claims that the trial court improperly (1) denied his motion for judgment of acquittal, (2) failed to provide a requested charge to the jury and (3) abused its discretion in precluding cross-examination of a state's witness with regard to statements made by a third party. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On September 17, 2006, Juan Nunez, Luis Santana and the defendant met with a drug dealer, known by the street name "Primo," in the Hill section of New Haven. At the meeting, Primo placed a $15,000 bounty for the killing of Aaron McRae, the victim, in response to the murder of one of Primo's associates, a man known as "Carlito." Nunez, Santana and the defendant had been friendly with Carlito. At the meeting, Primo provided Santana with two handguns, a nine millimeter semiautomatic pistol and a .38 caliber revolver.

After meeting with Primo, the defendant, Nunez and Santana were made aware that the victim was present in the area, and Nunez and the defendant proceeded to the victim's location near the Church Street South housing project. There, the defendant observed the victim talking to an unidentified black male.

According to the defendant, Santana, who at that point was positioned in an alleyway, ran across the street and fired a number of gunshots into the victim's back. Expert and forensic evidence revealed that the victim was killed by between seven and nine gunshot wounds, fired from two weapons. The New Haven police received a 911 call after the shooting wherein the caller stated that the victim had been shot by "two Spanish guys."

After the shooting, Nunez and the defendant fled to Nunez' house, where they met Santana. Santana changed clothing, and Santana and Nunez hid the weapons. Meanwhile, the defendant remained on Nunez' porch and smoked a cigarette.

Shortly thereafter, the police uncovered the handguns stashed at Nunez' house.[1] After the weapons were discovered, the defendant received a telephone call from Santana, who told the defendant that "they caught his guns," before hanging up. The police spoke with the defendant on several occasions after the murder, and, initially, he denied being in the area of the Church Street South housing project at the time of the shooting and, furthermore, denied any involvement in the shooting. Later, the defendant provided the police with a statement detailing his presence at the meeting with Primo, at the scene of the shooting and at Nunez' house after the shooting.

On December 16, 2006, the defendant was arrested in connection with the victim's murder. On April 13, 2009, the state filed an amended information, charging the defendant with the crimes of murder in violation of § 53a-54a, conspiracy to commit murder in violation of §§ 53a-48 and 53a-54a, criminal possession of a firearm in violation of General Statutes § 53a-217 (a) (1)

---

[1] Specifically, the police seized a .38 caliber revolver and a nine millimeter pistol from the apartment building where Nunez resided.

and carrying a pistol without a permit in violation of General Statutes § 29-35. At trial, the state adduced testimony from an expert witness who opined that DNA "mixtures" from three individuals were present on the handgrips of the two handguns seized by the police. The expert testified that the forensic evidence could not eliminate the defendant as a possible contributor with respect to the DNA on either weapon.

On April 16, 2007, after the close of the state's case-in-chief, the defendant filed a motion for a judgment of acquittal, which the court granted as to the counts alleging murder, criminal possession of a firearm and carrying a pistol without a permit. The court denied the motion as to the conspiracy count. On April 17, 2009, a jury found the defendant guilty on the count of conspiracy to commit murder. The court sentenced the defendant to a total effective sentence of twenty years incarceration, execution suspended after fifteen years, and five years probation.

Thereafter, the defendant filed a postverdict motion for a judgment of acquittal. On August 27, 2009, the court heard argument on the motion and, on August 28, 2009, issued a memorandum of decision denying the motion. This appeal followed. Additional facts will be set forth as necessary.

I

On appeal, the defendant first claims that the evidence was insufficient to support the conspiracy conviction. Specifically, the defendant argues that the only evidence connecting him to the shooting was his own statement to police investigators. The defendant claims that there was no evidence that he played a role in the shooting, "such as lookout, get away driver, or triggerman" and, furthermore, that there was no testimony that anyone saw him at the scene of the shooting. The defendant contends that his mere presence at three

locations associated with the murder, combined with inconclusive DNA evidence and evidence regarding Santana's telephone call, does not suffice to support his conviction on the conspiracy charge. We disagree.

We begin our analysis by setting forth the appropriate standard of review. "In reviewing the denial of a motion for [a] judgment of acquittal, we employ a two part analysis. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether, from all of the evidence and the reasonable inferences drawn therefrom, the jury reasonably could have concluded that the defendant was guilty beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Green*, 81 Conn. App. 152, 155, 838 A.2d 1030, cert. denied, 268 Conn. 909, 845 A.2d 413 (2004).

"To establish the crime of conspiracy to commit murder, the state must show that there was an agreement between two or more persons to cause the death of another person and that the agreement was followed by an overt act in furtherance of the conspiracy by any one of the conspirators. . . . In addition, the state also must show that the conspirators intended to cause the death of another person. . . . The existence of a formal agreement between the parties need not be proved. It is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Because of the secret nature of a conspiracy, a conviction is usually based on circumstantial evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Mourning*, 104 Conn. App. 262, 267–68, 934 A.2d 263, cert. denied, 285 Conn. 903, 938 A.2d 594 (2007).

The defendant's argument on appeal relies on the axiom that "mere presence at the scene of the crime, even coupled with the knowledge that a crime was being committed there, is not sufficient to establish

guilt of a conspiracy. . . . Evidence tending to show knowing participation in a conspiracy is also needed." (Citations omitted.) *State* v. *Stellato*, 10 Conn. App. 447, 454, 523 A.2d 1345 (1987). The defendant contends that the evidence adduced at trial was insufficient to establish anything other than his mere presence at the scene of the murder. Accordingly, the defendant argues that, on the basis of the record, no reasonable jury could have concluded that he agreed to participate in the conspiracy.

In proving the requisite element of agreement, "[i]t is not necessary to establish that the defendant and his coconspirators signed papers, shook hands or uttered the words we have an agreement . . . . Indeed, [b]ecause of the secret nature of conspiracies, a conviction is usually based on circumstantial evidence. . . . [A] conspiracy can be inferred from the conduct of the accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Forde*, 52 Conn. App. 159, 168, 726 A.2d 132, cert. denied, 248 Conn. 918, 734 A.2d 567 (1999). Although mere presence at a crime scene, standing alone, generally is insufficient to infer an agreement, "a defendant's knowing and willing participation in a conspiracy nevertheless may be inferred from his presence at critical stages of the conspiracy that could not be explained by happenstance . . . ." (Internal quotation marks omitted.) *United States* v. *Blackwood*, 366 Fed. Appx. 207, 210 (2d Cir. 2010); see also *United States* v. *Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002); *United States* v. *Pedroza*, 750 F.2d 187, 198–99 (2d Cir. 1984).

In the present matter, there was sufficient circumstantial evidence from which the jury reasonably could have inferred the defendant's knowing participation in a conspiracy to murder the victim. The defendant was not merely present at the scene of a shooting. Additionally, the defendant also was present at critical stages

in the planning and execution of the victim's murder, and the subsequent concealment of the weapons. See, e.g., *State* v. *Smith*, 15 Conn. App. 122, 126, 543 A.2d 301 (defendant's conduct before, during and after commission of crime providing sufficient evidence of participation in conspiracy to commit crime), cert. denied, 209 Conn. 805, 548 A.2d 441 (1988).

By his own account, the defendant was present when Primo planned the killing of the victim, provided weapons to Santana and offered $15,000 for the victim's murder. Upon learning that the victim was in the area, the defendant positioned himself in a location where he could not only observe the victim, but also observe Santana, who the defendant knew was armed. The defendant, by his own account, watched as Santana approached the victim from behind and fired a number of gunshots into his back. The defendant then fled the scene and met with Santana at Nunez' house. The defendant remained on the front porch of the house smoking a cigarette, while Nunez and Santana hid the murder weapons. The jury reasonably could have inferred that the defendant, knowing that Santana was going to kill the victim, acted as a lookout while he watched the murder take place, fled the scene thereafter and rejoined Santana and Nunez at Nunez' house, where he also acted as a lookout while Nunez and Santana hid the murder weapons.

Moreover, there was evidence that once the police had located the murder weapons, Santana contacted the defendant to inform him of the seizure. Additionally, DNA evidence produced at trial could not rule out that the defendant touched or handled the murder weapons. Finally, the defendant provided false statements to the police during their subsequent investigation regarding his presence at the murder scene. See *State* v. *Jimenez*, 74 Conn. App. 195, 212, 810 A.2d 848 (2002) (misstatement made to police subsequent to crime probative of

consciousness of guilt), cert. denied, 262 Conn. 947, 815 A.2d 677 (2003).

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [trier's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Green*, 62 Conn. App. 217, 223, 774 A.2d 157 (2001), aff'd, 261 Conn. 653, 804 A.2d 810 (2002). Construing the evidence in the light most favorable to sustaining the verdict, we conclude that the evidence was sufficient to support a finding beyond a reasonable doubt that the defendant had conspired to murder the victim.

II

The defendant next claims that the court improperly refused to include a requested adverse inference jury instruction relating to the failure of the police to preserve and to produce notes from interviews conducted with a concerned citizen informant and with the defendant. We disagree.

The following additional facts are relevant to our analysis. Detective Michael Hunter of the New Haven police department was involved with the investigation of the victim's murder. During the course of his investigation, Hunter was contacted by a concerned citizen informant. Hunter met with the concerned citizen and was told that a third party had contacted the concerned citizen and confessed to shooting the victim. During cross-examination by defense counsel, Hunter admitted that he likely had taken notes during his conversation with the concerned citizen, but that he had misplaced his investigation notes and was unable to locate them. Hunter also testified that his partner had taken notes during an interview with the defendant that occurred immediately prior to the defendant's giving a recorded

statement to the police. Hunter testified that he did not know the whereabouts of his partner's prestatement interview notes. Hunter further testified that his investigation notes had not been destroyed deliberately.

Thereafter, the defendant filed a request to charge, including the following proposed instruction: "That the jury can make an adverse inference if evidence were deliberately destroyed or ignored to prevent its utilization by the defense. Absent proof of such deliberate action, however, it is illogical to postulate that the failure even if negligent, of a police investigation to discover and record all available tangible evidence requires [an] inference that the evidence had it been discovered and recorded, would be favorable to the defendant. *State* v. *Santangelo*, 205 Conn. 578, 595–96 [534 A.2d 1175] (1987)." The court declined to give the requested charge, reasoning that the record did not provide a factual basis for such an instruction.[2]

"Although an adverse inference instruction may be appropriate under certain circumstances, a trial court is not required to give an adverse inference instruction in every case involving missing evidence. . . . [T]o prevail on appeal, [the defendant] must show both that the trial court abused its discretion in refusing to give the adverse inference instruction on the [missing evidence] and that it was more probable than not that the failure to give the requested instruction affected the result of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, 67 Conn. App. 299, 314, 786 A.2d 1269 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002).

---

[2] Specifically, the court stated: "Let me just say with respect to [the defendant's] . . . request to charge, which is that the jury can make an adverse inference if evidence were deliberately destroyed or ignored to prevent its utilization by the defense, I just do not believe that even looking at the case in the light most favorable to the defendant that a factual basis exists for such a charge, and it will not be given, and you can certainly have an exception on that."

We agree with the court's determination that there was no factual basis for the specific charge requested by the defendant. The record is bereft of any evidence from which a jury reasonably could infer that the police deliberately destroyed or ignored evidence to prevent its utilization by the defense. Accordingly, we do not conclude that the court abused its discretion in refusing to give the requested instruction under the circumstances.

Moreover, the defendant has failed to show that it was more probable than not that the failure to give the requested instruction affected the result of the trial. The defendant argues that, because the state's evidence was not clearly overwhelming, "a jury instruction that highlighted the deficiency of the investigation, and that fostered a pro-[d]efendant inference by the jury, likely would have changed the outcome [of the case]." The adverse inferences that the defendant claims the jury would have drawn had the court given the requested instruction, however, amount to nothing more than speculation on the part of the defendant. See *State* v. *Figueroa*, 235 Conn. 145, 175, 665 A.2d 63 (1995). Accordingly, under the circumstances presented, the court's refusal to give the requested adverse inference instruction was neither improper nor material to the outcome of the trial.

### III

The defendant's final claim on appeal is that the court abused its discretion in precluding his cross-examination of a state's witness regarding the police investigation. Specifically, the defendant argues that the court should have permitted defense counsel to inquire whether the defendant was identified by the concerned citizen who spoke to Hunter, as noted in part II of this opinion, because such evidence was not hearsay, in that the absence of a statement of positive identification

does not constitute assertive conduct.[3] The defendant contends that the court's restriction on cross-examination violated his rights under both the federal and state constitutions, as well as his common-law right to confrontation. We disagree.

The following additional facts are relevant to our analysis. During cross-examination of Hunter, defense counsel asked whether Hunter believed the information provided by the concerned citizen would have been valuable to the defendant. Hunter responded that he did not believe that the information was helpful to the defendant because "it doesn't take him out of it."

Outside the presence of the jury, defense counsel argued, over an objection by the state, that he should be allowed to question Hunter regarding statements made by the concerned citizen in order to impeach Hunter's testimony. The defendant's offer of proof provided that the concerned citizen had told Hunter that someone other than the defendant had shot the victim and that the concerned citizen had not mentioned the defendant. The court sustained the state's hearsay objection, noting that the statements the defendant sought to introduce only had impeachment value if offered for the truth of the matter asserted. The defendant then asked whether the court would permit the following question: "Did the concerned citizen mention [the defendant]?" The state objected to the question

---

[3] In addition to his claim that the proffered evidence did not constitute hearsay, the defendant also claims that the evidence falls within the identification exception to the hearsay rule. The defendant, however, failed to raise this exception at trial, arguing only that the evidence was admissible either (1) to impeach Hunter's statement or (2) under the state of mind exception to the hearsay rule. See Practice Book § 5-2. "To review claims articulated for the first time on appeal and not raised before the trial court would be nothing more than a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *In re Anna Lee M.*, 104 Conn. App. 121, 124 n.2, 931 A.2d 949, cert. denied, 284 Conn. 939, 937 A.2d 696 (2007); see also Practice Book § 60-5. We therefore decline to review this claim.

on hearsay grounds, and the court again sustained the state's objection.[4]

The standard of review applicable to the defendant's evidentiary claim is well established. Our review of

---

[4] The following colloquy took place outside the presence of the jury with regard to the proposed question:

"[Defense Counsel]: Would the court permit this one question? Did the concerned citizen mention [the defendant]?

"The Court: Well, I take it, the question—the answer to that is no?

"[Defense Counsel]: That's correct.

"The Court: Excuse me. The answer to that is no?

"[Hunter]: Yes, Your Honor.

"The Court: Yes, the—

"[Hunter]: I'm sorry. No.

"The Court: Yes, the answer is no. Well, I guess that that is—I'm trying to think that—I'm trying to think if that calls for a hearsay response. It may not. Do you object to that question?

"[The Prosecutor]: I do, Your Honor, because what it is—you know it's one thing to say what did the concerned citizen say. Clearly, that would elicit a hearsay response.

"The Court: Right.

"[The Prosecutor]: This is doing the exact same thing in a sense, because what it's doing is—the question—

"The Court: The dog that didn't bark in the night.

"[The Prosecutor]: Right. The question presumes facts.

"The Court: The objection is sustained."

The court's reference to "[t]he dog that didn't bark in the night" is to a point made by Sherlock Holmes in Silver Blaze, a story by Sir Arthur Conan Doyle, where the fact that a dog did not bark during the night when a race horse was removed from a stable was an important clue to solve the mystery of who removed that horse from the stable. The point is highlighted in the story as follows:

" 'Is there any point to which you would wish to draw my attention?'

" 'To the curious incident of the dog in the night-time.'

" 'The dog did nothing in the night-time.'

" 'That was the curious incident,' remarked Sherlock Holmes.

* * *

" 'Before deciding that question I had grasped the significance of the silence of the dog, for one true inference invariably suggests others. The Simpson incident had shown me that a dog was kept in the stables, and yet, though some one had been in and had fetched out a horse, he had not barked enough to arouse the two lads in the loft. Obviously the midnight visitor was someone whom the dog knew well.' " A.C. Doyle, The Complete Sherlock Holmes, Vol. 1 (Barnes & Noble Classics 2003) Silver Blaze, pp. 413, 415.

whether the challenged answer sought to be elicited by the question properly may be classified as hearsay or whether a hearsay exception properly is identified is plenary. See *State* v. *Davis*, 298 Conn. 1, 10, 1 A.3d 76 (2010). "We review the trial court's decision to admit [or exclude] evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) Id., 10–11. If the court "properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail." Id., 11.

The defendant argues that the court improperly precluded inquiry into whether he was identified by the concerned citizen. The defendant contends that the evidence he sought to introduce was not hearsay and specifically argues that there "was no indication that there was any communicative conduct during the interview of the concerned citizen, let alone conduct intended as an assertion."

" 'A statement made out-of-court that is offered to establish the truth of the matter contained in the statement is hearsay, and as such is inadmissible. . . .' A 'statement,' as that term is used in the hearsay rule and its exceptions, is defined in § 8-1 (1) of the Connecticut Code of Evidence as '(A) an oral or written assertion or (B) nonverbal conduct of a person, if it is intended by the person as an assertion.' The commentary to the rule further explains that '[t]he effect of this definition is to exclude from the hearsay rule's purview nonassertive verbalizations and nonassertive, nonverbal conduct.' Conn. Code Evid. § 8-1 (1), commentary. Moreover, in *State* v. *Vitale*, 197 Conn. 396, 405, 497 A.2d 956 (1985), [the court] concluded that where silence is offered as nonverbal conduct, such evidence is inadmissible unless it is 'a reliable indicator of what the [proferring party] claims it tended to communicate . . . .' " (Cita-

tions omitted.) *State* v. *Carpenter*, 275 Conn. 785, 859, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The evidence the defendant sought to introduce would only have value in impeaching Hunter's statement that the concerned citizen did not "take [the defendant] out of it"—the purpose for which the defendant sought to introduce the evidence—if a fact finder could infer from the concerned citizen's silence that the defendant had no association or involvement with the crime. Accordingly, the defendant sought to use the concerned citizen's silence in an assertive manner. See *State* v. *King*, 249 Conn. 645, 670–72, 735 A.2d 267 (1999). Moreover, even if we were to assume that the concerned citizen's failure to mention the defendant should be construed as nonassertive conduct, such silence as to the defendant's participation in the planning, execution and aftermath of the crime, standing alone, would not contradict Hunter's testimony. Under either view of the evidence, the proffered testimony properly was excluded. See, e.g., id., 670–74.[5]

Because we determine that the court properly excluded the proffered evidence, the defendant's constitutional claims necessarily fail. See *State* v. *Davis*, supra, 298 Conn. 11.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] Furthermore, the defendant has failed to include in his appellate brief any analysis of the effect, if any, of the fact that the operative declarant in the present matter is not the concerned citizen but is the individual who relayed the information to the concerned citizen. That is, the defendant has failed to offer any analysis as to how the evidence sought to be offered would overcome this additional exclusionary hurdle. See *Miron* v. *University of New Haven Police Dept.*, 284 Conn. 35, 51, 931 A.2d 847 (2007) ("[h]earsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception" [internal quotation marks omitted]).