# SUSAN M. MIRON *v.* UNIVERSITY OF NEW HAVEN POLICE DEPARTMENT ET AL.
## (SC 17596)

Borden, Katz, Palmer, Vertcfeuille and Zarella, Js.*

---

* The listing of justices reflects their seniority status on this court as of the date of argument.

Argued March 7—officially released September 25, 2007

*Lewis Chimes*, with whom, on the brief, were *Stephen Fitzgerald, Lynda Rizzo* and *Alexandra Block*, for the appellant (plaintiff).

*Aaron S. Bayer*, with whom were *Kim E. Rinehart*, and, on the brief, *Cheryl E. Johnson, Elliot B. Spector* and *William C. Berry*, for the appellees (defendants).

*Opinion*

BORDEN, J. The plaintiff in this tort action, Susan M. Miron, appeals[1] from the judgment of the trial court

[1] The plaintiff appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

rendered in favor of the defendants, the University of New Haven Police Department (university), and two sergeants of the university's police department, David Sweet and Richard Montefusco. The plaintiff claims that the court improperly: (1) afforded a qualified privilege to the statements of Sweet; (2) excluded relevant testimony pertaining to the effect of Sweet's statements; and (3) precluded relevant comparative evidence of disparate treatment. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In July, 1999, the plaintiff began her career in law enforcement as an officer with the university's police department. During the first four months of her career, she attended the Connecticut state police academy training program. Thereafter, she was assigned to patrol the university's campus under the supervision of Sweet, who recently had been promoted to sergeant. From time to time, the plaintiff also was supervised by Montefusco. Due to a severe ear infection for which she underwent surgery, the plaintiff was absent from work for two weeks in January, 2000. That same month, the university's police chief, Henry Starkel, evaluated the plaintiff's performance as "satisfactory" in sixteen categories and "commendable" in two.[2] In February, 2000, the plaintiff obtained her police officer standards and training certification. In June, 2000, in anticipation of the conclusion of the plaintiff's probationary period with the university, Starkel again evaluated the plaintiff's performance. In that evaluation, he indicated that the plaintiff's performance was deficient in certain areas, chiefly her attention to detail in written reports.

In April, 2000, the plaintiff applied for a position with the Glastonbury police department. As part of the

[2] The plaintiff also received commendations for working at winter graduation and for participating in drug surveillance operations.

department's review of the plaintiff's application, a Glastonbury investigator interviewed Sweet and Starkel in June, 2000.[3] In addition, Sweet completed an employment questionnaire. During the interview, Sweet and Starkel intimated that the plaintiff too often had been absent from work. Specifically, they indicated that from July 1, 1999, to June, 30, 2000, the plaintiff had been out of work due to illness a total of nineteen days, and that she also had used eleven vacation days. Sweet and Starkel also stated that on one occasion, the plaintiff had been out of work on an approved medical leave but had been seen dancing at a nightclub.[4] In his written remarks, Sweet evaluated the plaintiff's leadership ability as "poor" and indicated that, at times, she had been "negative or uncaring . . . ." He described her police skills as "marginal at best," clarifying that by that he meant: "her report writing skills, the way she interviews people, her lack of confidence when pulling over a motor vehicle." In July, 2000, the Glastonbury police department rejected the plaintiff's application.

In June, 2000, the plaintiff applied for a position with the Enfield police department. As part of that department's background investigation, one of its detectives interviewed Sweet, who again completed a questionnaire. In his written statement to the Enfield police department, Sweet indicated that the plaintiff had a "know it all at[t]itude" and that "her performance is not where it should be . . . ." He also opined that the plaintiff was not "ready to work for [a] regular [p]olice [department] but maybe in time and [with] additional training she would be." Despite Sweet's negative statements, the Enfield police department hired the plaintiff,

---

[3] As part of her application, the plaintiff expressly agreed that she was "willing to have [her] present employer contacted regarding [her] qualifications and work performance."

[4] The plaintiff testified that she was seen in Hartford on her regular night off, and that the two week recovery period prescribed by her physician had concluded the day before.

who joined the force on a probationary basis in August, 2000.

Thereafter, the plaintiff commenced the first five week phase of a sixteen week training program under the supervision of Charles Grasso, a field training officer with the Enfield police department. As part of that training program, Grasso completed daily reports of the plaintiff's performance, and the field training coordinator, Sergeant William Zaczynski, completed weekly reports. The reports were on standardized forms. The daily observation form provided a scale of one to seven in thirty-one categories, with the score of seven representing superior skill and scores of four and above considered "acceptable." The "coordinator's weekly report" provided space for narrative responses in certain categories, including strengths and weaknesses, recommendations, and additional comments.

In his daily reports, Grasso assigned the plaintiff a score of four in most categories, but consistently scored the plaintiff lower in the areas of orientation and officer safety. Grasso also criticized the plaintiff's use of the radio and, at times, her temperament. In his weekly reports, Zaczynski voiced concern about the plaintiff's overall performance, namely, her weaknesses in officer safety and "field performance under stress," as well as her difficulty navigating town roads. Accordingly, he added an additional four weeks to the plaintiff's first phase of training, stating that "[i]f there is not *significant* improvement in [the plaintiff's] performance, I can not recommend she continue." (Emphasis in original.)

For two of those four weeks, Zaczynski assigned the plaintiff to a different field training officer, Marianne Christensen. He did so "on the outside chance" that the plaintiff's lack of progress "might be a personality conflict . . . ." At the conclusion of that two week period, however, Christensen also reported that the

plaintiff struggled in the areas of orientation and officer safety. She stated that, "[d]ue to the inconsistencies with [the plaintiff's] performance on basic skills, I can not recommend [she] move on to [p]hase [two]." At that point, Zaczynski recommended that the plaintiff not continue with the program. The deputy chief of the Enfield police department, however, ordered the plaintiff to attend an additional week of training, during which she was assigned to field training officer Edward Kaczmarek. After that final week of intensive remedial training, Kaczmarek also concluded that the plaintiff was not ready to advance to phase two. On November 14, 2000, the plaintiff received notice of her termination from the Enfield police department.

Thereafter, the plaintiff initiated the present action for: (1) defamation and tortious interference with a business expectancy by Sweet, as to the plaintiff's application with the Glastonbury police department; (2) defamation and tortious interference with a business expectancy by Sweet and Montefusco, as to the plaintiff's discharge from the Enfield police department; and (3) intentional infliction of emotional distress on the part of Montefusco. In support of her claims, the plaintiff alleged not only that Sweet's negative comments in reference to the plaintiff's employment applications with the Glastonbury and Enfield police departments were defamatory, but also that, during the course of her training with the Enfield police department, Sweet and Montefusco had communicated further disparaging remarks about the plaintiff to members of the Enfield police department. The jury returned a verdict in favor of the defendants. The plaintiff subsequently filed a motion to set aside the verdict, which motion the court denied. This appeal followed. Additional facts and procedural history will be set forth as necessary.

## I

The plaintiff's first claim is that the trial court improperly concluded that Sweet's statements to the Glastonbury police department were subject to a qualified privilege. Specifically, the plaintiff contends that General Statutes §§ 31-128e[5] and 31-128f[6] of the Connecticut personnel files act, and the state's blacklisting statute; General Statutes § 31-51;[7] preclude the application of a

---

[5] General Statutes § 31-128e provides: "If upon inspection of his personnel file or medical records an employee disagrees with any of the information contained in such file or records, removal or correction of such information may be agreed upon by such employee and his employer. If such employee and employer cannot agree upon such removal or correction then such employee may submit a written statement explaining his position. Such statement shall be maintained as part of such employee's personnel file or medical records and shall accompany any transmittal or disclosure from such file or records made to a third party."

[6] General Statutes § 31-128f provides in relevant part: "No individually identifiable information contained in the personnel file or medical records of any employee shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except where the information is limited to the verification of dates of employment and the employee's title or position and wage or salary . . . ."

[7] General Statutes § 31-51 provides: "Any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, who blacklists any employee, mechanic or laborer, or publishes or causes to be published the name of any such employee, mechanic or laborer, with the intent and for the purpose of preventing such employee, mechanic or laborer from engaging in or securing employment from any other person, corporation, company, firm, or the state or any political subdivision thereof, or, in any manner, conspires or contrives, by correspondence or otherwise, to prevent such employee, mechanic or laborer from procuring employment, shall be fined not less than fifty and not more than two hundred dollars; but the provisions of this section shall not be construed so as to prohibit any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, from giving a truthful statement of any facts concerning a present or former employee of such person, corporation, company, firm, or the state or any political subdivision thereof, on the application of such employee or of any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, who may be considering the employment of such employee."

qualified privilege to statements made in the context of an employment reference. We disagree.

The following additional facts and procedural history are relevant to this claim of the plaintiff. At the close of evidence, the parties submitted proposed jury instructions and interrogatories to the court. Over the plaintiff's objection, the court instructed the jury that Sweet's statements to the Glastonbury police department were subject to a qualified privilege. The court charged the jury that "the statements made by [Sweet] to the investigators from Glastonbury . . . in the course of interviews conducted as part of background checks of the plaintiff . . . are protected by qualified privilege." The court then explained that qualified privilege could be overcome by establishing that Sweet acted "with malice," which the court broadly described as follows: "[Y]ou ordinarily think of malice as hatred, ill will, a desire to injure, or like feelings on the part of one person toward another. The meaning which we give malice in law includes such feelings, but also includes any improper or unjustifiable motives." The court added that malice also exists if Sweet acted without good faith or with knowledge of the falsity, or reckless disregard as to the truth, of the statements.[8] The

[8] We note that the plaintiff challenges the fact that the court gave an instruction on qualified privilege, not its content. Accordingly, "we need not decide whether, in a defamation action such as this one, a plaintiff could prove actual malice to defeat the qualified privilege on some lesser showing of recklessness. See *Bishop* v. *Kelly*, 206 Conn. 608, 614, 539 A.2d 108 (1988) (defining recklessness); cf. *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (first amendment does not invalidate award of damages in defamation action by nonpublic figure against nonmedia defendant involving issue of purely private concern). We also need not decide whether a plaintiff alleging defamation could overcome the qualified privilege without proving actual malice, by proving a lack of good faith on the part of the employer. Compare *Bleich* v. *Ortiz*, [196 Conn. 498, 504, 493 A.2d 236 (1985)] (qualified privilege may be overcome on finding of bad faith or improper motive), *Charles Parker Co.* v. *Silver City Crystal Co.*, [142 Conn. 605, 615, 116 A.2d 440 (1955)] (qualified privilege may be overcome on finding of bad faith), and *Miles* v. *Perry*, [11 Conn. App. 584, 594–95 and 594 n.8, 529 A.2d 199 (1987)], to 3 Restatement (Sec-

jury interrogatories reflected that charge.[9] Although the jury concluded that Sweet had defamed the plaintiff, it did not find that Sweet's statements were made with malice. See footnote 9 of this opinion.

Whether a communication is made upon an occasion of privilege is a question of law. *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 28, 662 A.2d 89 (1995). Therefore, our review is plenary.

The question of whether a qualified privilege applies to employment references to which an employee has provided consent is one of first impression in this state. A review of other jurisdictions, however, reveals that many have adopted a qualified privilege for such communications. See, e.g., *Hayes* v. *Wal-Mart Stores, Inc.*, 953 F. Sup. 1334, 1342–43 (D. Ala. 1996) (applying Alabama law); *Zuschek* v. *Whitmoyer Laboratories, Inc.*,

ond), Torts § 600 (1977) (lack of good faith insufficient to defeat privilege; statement must be made with actual knowledge of falsity or reckless disregard as to truth), and R. Smolla, [Law of Defamation (1994)] § 15.07 [2] [b] (arguing that, because of importance of frankness in employee review process, privilege protecting such communications should be defeasible only upon proof of actual malice). Finally, we need not decide whether a plaintiff could overcome the qualified privilege without proving actual malice, by proving that the defamatory statement had been published to others not involved in the management or review of employees. See *Miles* v. *Perry*, supra, 595; see also 3 Restatement (Second), [supra, §§ 603 through 605] (summarizing conditions in which privilege is defeated)." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 30–31 n.12, 662 A.2d 89 (1995).

[9] With regard to Sweet's statements to the Glastonbury police department, the jury interrogatories and the answers to them were as follows: (1) "Has [the] plaintiff proven by a preponderance of the evidence that [Sweet] made a defamatory statement of objective fact about her to a representative of the [Glastonbury] police department?" The jury answered: "Yes." (2) "Have . . . Sweet and [the university] proven by a preponderance of the evidence that the statement was true?" The jury answered: "No." (3) "Has [the] plaintiff proven by a preponderance of the evidence that [Sweet's] statements to [the] Glastonbury [police department] were made with malice?" The jury answered: "No." The third interrogatory continued: "If your answer to this question is NO, your verdict [on this count] is for . . . Sweet and [the university]."

430 F. Sup. 1163, 1165 (E.D. Pa. 1977) (applying Pennsylvania law); *Kenney* v. *Gilmore*, 195 Ga. App. 407, 409, 393 S.E.2d 472 (1990); *Chambers* v. *American Trans Air, Inc.*, 577 N.E.2d 612, 615 (Ind. App. 1991); *Holdaway Drugs, Inc.* v. *Braden*, 582 S.W.2d 646, 649–50 (Ky. 1979); *Butler* v. *Folger Coffee Co.*, 524 So. 2d 206, 206–207 n.1 (La. App. 1988); *Jacron Sales Co.* v. *Sindorf*, 276 Md. 580, 600, 350 A.2d 688 (1976); *Burns* v. *Barry*, 353 Mass. 115, 118–19, 228 N.E.2d 728 (1967); *Dalton* v. *Herbruck Egg Sales Corp.*, 164 Mich. App. 543, 548, 417 N.W.2d 496 (1987); *Stuempges* v. *Parke, Davis & Co.*, 297 N.W.2d 252, 257 (Minn. 1980); *Carter* v. *Willert Home Products, Inc.*, 714 S.W.2d 506, 513 (Mo. 1986); *Circus Circus Hotels, Inc.* v. *Witherspoon*, 99 Nev. 56, 63 n.3, 657 P.2d 101 (1983); *Erickson* v. *Marsh & McLennan Co.*, 117 N.J. 539, 562, 569 A.2d 793 (1990); *Gengler* v. *Phelps*, 92 N.M. 465, 466–68, 589 P.2d 1056 (1978); *Walsh* v. *Consolidated Freightways, Inc.*, 278 Or. 347, 355, 563 P.2d 1205 (1977); *Swanson* v. *Speidel Corp.*, 110 R.I. 335, 340, 293 A.2d 307 (1972); *Pioneer Concrete of Texas, Inc.* v. *Allen*, 858 S.W.2d 47, 49 (Tex. App. 1993); *Bankhead* v. *Tacoma*, 23 Wash. App. 631, 639, 597 P.2d 920 (1979); *Calero* v. *Del Chemical Corp.*, 68 Wis. 2d 487, 498, 228 N.W.2d 737 (1975). The plaintiff presents no authority to the contrary.

These cases comport with the view expressed in comment (i) of the Restatement (Second) of Torts,[10] which

---

[10] Section 595 of 3 Restatement (Second), Torts (1977), provides in relevant part: "(1) An occasion makes a publication conditionally privileged if the circumstances induce a correct or reasonable belief that

"(a) there is information that affects a sufficiently important interest of the recipient or a third person, and

"(b) the recipient is one to whom the publisher is under a legal duty to publish the defamatory matter or is a person to whom its publication is otherwise within the generally accepted standards of decent conduct.

"(2) In determining whether a publication is within generally accepted standards of decent conduct it is an important factor that

"(a) the publication is made in response to a request rather than volunteered by the publisher . . . ."

provides that "[u]nder many circumstances, a former employer of a servant is conditionally privileged to make a defamatory communication about the character or conduct of the servant to a present or prospective employer." 3 Restatement (Second), Torts § 595, comment (i), p. 273 (1977). In defining the contours of defamation claims in this state, we consistently have looked to the Restatement (Second). See, e.g., *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004) (declining to adopt doctrine of compelled self-publication defamation); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29 (recognizing qualified privilege for intra-corporate communication regarding employee performance). Accordingly, we conclude that it is appropriate to follow the Restatement (Second) in the present case, and to recognize a qualified privilege for the employment references of current or former employers that were solicited with the employee's consent.

Our conclusion that such references are qualifiedly privileged is consistent with our relevant precedent. We have, for example, recognized a qualified privilege for statements made in the employment setting regarding the qualifications and fitness of an employee. *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 545, 733 A.2d 197 (1999); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29; *Gray* v. *Mossman*, 88 Conn. 247, 250, 90 A. 938 (1914). We have stated that "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 29. Similarly, we believe that the integrity of employment references not only is

essential to prospective employers, but also to prospective employees, who stand to benefit from the credibility of positive recommendations.

Moreover, we specifically have expressed concern about chilling communications between former and future employers. In declining to adopt the cause of action of compelled self-publication defamation,[11] we stated that its recognition likely would "encourage employers to curtail communications with employees, and the employees' *prospective* employers, for fear of liability." (Emphasis added.) *Cweklinsky* v. *Mobil Chemical Co.*, supra, 267 Conn. 220. We were concerned that employers would choose "a culture of silence . . . rather than rely on truth as a defense to a defamation claim." (Citation omitted; internal quotation marks omitted.) Id., 229. The same policy concern informs our view of the present case. It also would encourage a "culture of silence" not to afford a qualified privilege to employment references that are made in good faith and without improper motive. See B. Saxton, "Flaws in the Laws Governing Employment References: Problems of 'Overdeterrence' and a Proposal for Reform," 13 Yale L. & Policy Rev. 45, 46–49 (1995) (documenting problem of increasing adoption of "no comment" policies among employers).

The plaintiff argues that §§ 31-128e and 31-128f of the personnel files act preclude the application of a qualified privilege to statements made in the context of an employment reference. See *Chadha* v. *Charlotte*

---

[11] That cause of action would have carved out an exception to the general rule that "no action for defamation exists if the defendant publishes the defamatory statements to only the plaintiff, and the plaintiff subsequently disseminates the statements to a third person" because, in the employment context, "the person effectively is 'compelled' to publish the defamatory statement to prospective employers when the person is asked why he or she left his or her former employment." *Cweklinsky* v. *Mobil Chemical Co.*, supra, 267 Conn. 217–18.

*Hungerford Hospital*, 272 Conn. 776, 791, 865 A.2d 1163 (2005) (regarding legislative abrogation of common-law immunity). Specifically, the plaintiff contends that the personnel files act governs communication between former and prospective employers, and that our conclusion undermines the purpose of the statute. We disagree.

The personnel files act affords an employee the right to inspect his or her employment file; General Statutes § 31-128b;[12] and to request the removal or correction of information therein with which the employee disagrees. General Statutes § 31-128e.[13] If the employer refuses to grant such a request, then the employee may submit "a written statement explaining his position," which shall be maintained as part of the file. General Statutes § 31-128e.

The personnel files act further provides that "[n]o individually identifiable information contained in the personnel file . . . shall be disclosed by an employer to any person or entity not employed by or affiliated with the employer without the written authorization of such employee except where the information is limited to the verification of dates of employment and the employee's title or position and wage or salary . . . ." General Statutes § 31-128f.

Far from claiming that the university improperly disseminated her file; see footnote 3 of this opinion; the

---

[12] General Statutes § 31-128b provides: "Each employer shall, within a reasonable time after receipt of a written request from an employee, permit such employee to inspect his personnel file if such a file exists. Such inspection shall take place during regular business hours at a location at or reasonably near the employee's place of employment. Each employer who has personnel files shall be required to keep any personnel file pertaining to a particular employee for at least one year after the termination of such employee's employment."

We note that the personnel files act does not actually require employers to keep such files. See General Statutes § 31-128b ("if such a file exists").

[13] See footnote 5 of this opinion.

plaintiff argues that employment references do not warrant a qualified privilege for information *not* documented in the employee's personnel file and, thus, information that the employee has not had the opportunity to review or correct. We find no support in the personnel files act, however, for the proposition that the legislature intended therein to place any limit on the scope of an employee's consent to an employment reference,[14] which reference properly may supplement data contained in the employee's file with the good faith observations and impressions of the employer. Prospective employers are free, of course, to consider the weight and credibility of such observations and impressions in light of their convergence with or divergence from the contents of the employee's file.

We also disagree with the plaintiff's argument that our conclusion is inconsistent with the language of the state's blacklisting statute. See footnote 7 of this opinion. In its entirety, § 31-51 provides: "Any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, who blacklists any employee, mechanic or laborer, or publishes or causes to be published the name of any such employee, mechanic or laborer, with the intent and for the purpose of preventing such employee, mechanic or laborer from engaging in or securing employment from any other person, corporation, company, firm, or the state or any political subdivision thereof, or, in any manner, conspires or contrives, by correspondence or otherwise, to prevent such employee, mechanic or laborer from procuring employment, shall be fined not less than fifty and not more than two hundred dollars;

---

[14] In her reply brief, the plaintiff suggests that the scope of her consent did not extend beyond the contents of her personnel file. In support, she cites *Brown* v. *Soh*, 280 Conn. 494, 909 A.2d 43 (2006). We fail to see, however, the relevance of that case, in which we held that releases exculpating employers for negligence violate public policy; id., 506; to the present one, in which the plaintiff simply consented to having a former employer contacted by a prospective one.

but the provisions of this section shall not be construed so as to prohibit any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, from giving a truthful statement of any facts concerning a present or former employee of such person, corporation, company, firm, or the state or any political subdivision thereof, on the application of such employee or of any person, or any officer or agent of any corporation, company, firm, or the state or any political subdivision thereof, who may be considering the employment of such employee."

Section 31-51 requires proof that an employer acted with an improper motive, namely, the intent to prevent an employee from securing employment. In the present case, the judge instructed the jury that a qualified privilege is destroyed when one acts with malice or "improper or unjustifiable motives." Accordingly, the qualified privilege afforded in the present case is not in conflict with the blacklisting statute.

## II

The plaintiff next claims that the trial court improperly excluded certain direct testimony of the plaintiff regarding certain statements that Grasso had made to her. Specifically, she sought to testify that Grasso had told her that Sweet had told certain Enfield field training officers that the plaintiff was having an affair, and that Grasso had said that the rumored affair was the topic of discussion at a meeting of field training officers. The plaintiff contends that the trial court improperly deemed the testimony hearsay because Grasso's statement was offered, not for the truth of the matter asserted therein, but rather to show his state of mind. See Conn. Code Evid. § 8-3 (4).[15] We conclude, to the

[15] Section 8-3 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness . . . .

"(4) . . . A statement of the declarant's then-existing mental or emotional condition, including a statement indicating a present intention to do a partic-

contrary, that the trial court properly excluded the testimony as inadmissible hearsay.

The following additional facts and procedural history are relevant to this claim. Through her own testimony, the plaintiff sought to introduce evidence that, during her first few weeks of training with the Enfield police department, Grasso had told her that fellow field training officers had said that her former supervisor—presumably, Sweet—had said that the plaintiff was having an affair. At trial, the plaintiff argued that the testimony was offered, not for the truth of the matter asserted, but rather to prove that Sweet's statements had interfered with the plaintiff's employment with the Enfield police department because they " 'poisoned' " the evaluation process. After a lengthy colloquy, the court sustained the defendants' objection and allowed the plaintiff to ask only whether Grasso had asked her if she was having an affair. On appeal, the plaintiff renews her claim that the testimony falls within the state of mind exception to the hearsay rule, on the ground that the statement goes to the motive of the field training officers to treat the plaintiff unfairly.

We first consider our scope of review of this ruling. Under these circumstances, where the question of admissibility of the testimony involves the application of the definition of hearsay, and the rule of hearsay within hearsay, to the undisputed statement offered, the question of admissibility presents a question of law, and our scope of review is plenary. See *State* v. *Saucier,* 283 Conn. 207, 214, 926 A.2d 633 (2007). " 'Hearsay' means a statement, other than the one made by the declarant while testifying at the proceeding, offered in evidence to establish the truth of the matter asserted."

ular act in the immediate future, provided that the statement is a natural expression of the condition and is not a statement of memory or belief to prove the fact remembered or believed. . . ."

Conn. Code Evid. § 8-1 (3). "Hearsay is inadmissible, except as provided in the Code, the General Statutes or the Practice Book." Conn. Code Evid. § 8-2. "Hearsay within hearsay is admissible only if each part of the combined statements is independently admissible under a hearsay exception." (Internal quotation marks omitted.) *State* v. *Pierre*, 277 Conn. 42, 64, 890 A.2d 474, cert. denied, 547 U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006), quoting Conn. Code Evid. § 8-7.

In the present case, the plaintiff sought to introduce a statement containing three levels of hearsay: (1) Sweet's alleged statement to an unidentified Enfield officer; (2) that officer's statement to Grasso; and (3) Grasso's statement to the plaintiff. As a party opponent, Sweet's own statement is admissible. See Conn. Code Evid. § 8-3 (1). Moreover, the plaintiff did not intend to introduce the statement that the plaintiff was having an affair for its truth. Nevertheless, the unidentified officer's statement to Grasso as well as Grasso's statement to the plaintiff were only relevant if offered for their truth, namely, to prove that Sweet *had said* that the plaintiff was having an affair. Accordingly, the trial court properly excluded the statements as hearsay.

We are not persuaded by the plaintiff's argument that Grasso's statement is relevant to prove his state of mind, namely, that Sweet's statement had affected Grasso's ability to evaluate fairly the plaintiff's performance.[16] Although she cites the state of mind exception; Conn. Code Evid. § 8-3 (4); the plaintiff's argument really is

[16] We note that, in her initial brief, the plaintiff intimates that Grasso's statement was relevant to prove *Sweet's* state of mind, namely, his intent to interfere with her business relationship with the Enfield police department. In her reply brief, however, the plaintiff explicitly states that the statement is admissible to show *Grasso's* state of mind. There is no question that the first layer of hearsay—Sweet's alleged statement—was a statement of a party opponent. Conn. Code Evid. § 8-3 (1). Accordingly, we need not consider the plaintiff's argument regarding the state of mind exception as it pertains to Sweet.

that Sweet's statement was offered, not for the truth of the matter asserted, but rather for its effect on Grasso.[17] See *State* v. *Alvarez*, 216 Conn. 301, 310–11, 579 A.2d 515 (1990). The plaintiff's argument, however, ignores the layered nature of the hearsay in the present case. Grasso heard Sweet's statement indirectly, through an unidentified officer. That unidentified officer's statement to Grasso was being offered to prove the truth of the matter asserted therein: that Sweet *had said* the plaintiff was having an affair. The plaintiff has made no argument, however, that the statement of the unidentified officer to Grasso falls under an exception to the hearsay rule.

## III

We turn finally to the plaintiff's third claim, namely, that the trial court improperly excluded comparative evidence of the training and evaluation of four other Enfield police officer candidates. Specifically, the plaintiff argues that this evidence of disparate treatment is susceptible to an inference that the termination of the plaintiff from the Enfield police department was not based on her performance, but rather on the defamatory statements of Sweet and Montefusco.

The following additional facts and procedural history are relevant to this claim. In support of the plaintiff's allegation that Sweet and Montefusco made defamatory statements about her to members of the Enfield police department, the plaintiff offered the testimony of Catherine Dolan, an officer of the university's police department.[18] Dolan testified that she had overheard Sweet and Montefusco making defamatory statements to

---

[17] Grasso's statement—namely, that an unidentified officer said that Sweet said that the plaintiff was having an affair—does not bear on Grasso's state of mind within the meaning of that exception, because it does not reveal his "then-existing mental or emotional condition . . . ." Conn. Code Evid. § 8-3 (4).

[18] Dolan joined that force after the plaintiff's resignation.

members of the Enfield police department. None of the plaintiff's field training officers, however, testified to speaking with either Sweet or Montefusco. The plaintiff also sought to introduce evidence regarding the scores and evaluations of four other police officers, each of whom successfully had advanced to the second phase of the Enfield police department's field training program. The plaintiff argued that this evidence was necessary to impeach defense testimony that her termination was based on her poor performance.

The trial court excluded the evidence of disparate treatment on the ground that it was irrelevant because the field training program was not comparative, insofar as its candidates were not in competition for a limited number of open positions. In addition, the court determined that the burden of presenting the evidence would outweigh its probative value.[19]

On appeal, the plaintiff renews her claim that the comparative evidence of the scores of other trainees is relevant to show that the plaintiff's "opportunity at Enfield was poisoned by the spread of false and defamatory rumors by Sweet and Montefusco." The defendants counter that the trial court properly excluded the scores as irrelevant because the plaintiff did not provide an adequate foundation for the evidence. Specifically, the defendants contend that the probative value of the test scores is undermined by the attenuated chain of inferences necessary to reach the plaintiff's desired conclusion. We agree with the defendants.

This court will overturn an evidentiary ruling only upon a showing of a clear abuse of the court's discre-

---

[19] Specifically, the court stated that it would be infeasible to limit the comparative evidence to the four officers presented by the plaintiff. Instead, the court concluded, the defendants would have to be afforded the right to cross-examine and present evidence regarding the evaluation of other candidates, successful and unsuccessful, who also had participated in the field training program.

tion. *Smith* v. *Greenwich*, 278 Conn. 428, 446, 899 A.2d 563 (2006). In the present case, the plaintiff offered evidence of her disparate treatment on the basis that the jury could infer that some other improper motive had been the actual cause for her discharge, namely, the defamatory comments about which Dolan testified. To arrive at that conclusion, however, the jury would have had to infer that: (1) the Enfield police department trained and evaluated other, similarly situated and performing police candidates differently from the plaintiff; (2) the plaintiff's training and evaluation were unfair relative to those other candidates; (3) the decision of the Enfield police department to terminate the plaintiff's employment was, therefore, based on some other, impermissible ground; (4) Sweet and Montefusco made defamatory statements to a member of the Enfield police department; (5) that the unidentified recipient of those statements communicated them to the plaintiff's field training officers; (6) upon hearing those defamatory statements, the field training officers were biased in their evaluation of the plaintiff; and (7) the field training officer's biased evaluations were the basis for the plaintiff's termination. Accordingly, we conclude that the trial court properly exercised its discretion to exclude the comparative evidence.

The plaintiff argues that the comparative evidence offered in the present case is warranted under the employment discrimination jurisprudence set forth in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). We disagree. That case and its progeny established a burden shifting mechanism that employs comparative evidence of a *defendant* employer's treatment of similarly situated employees to show that the employer's proffered reason for action against the plaintiff employee was a pretext for discrimination. Id., 802–804. In the present case, the plaintiff sought to introduce the comparative practices,

not of the defendants, but rather of a third party, namely, the Enfield police department. Accordingly, that evidence is of minimal probative value as to the liability of the defendants, and it was, therefore, within the discretion of the trial court to exclude it.

The judgment is affirmed.

In this opinion the other justices concurred.

---

* The listing of justices reflects their seniority status on this court as of the date of oral argument.