Nathaniel **BELANGER**, Plaintiff,

v.

**SWIFT TRANSPORTATION, INC.,** Defendant.

No. 06–cv–1967 (JBA).

United States District Court, D. Connecticut.

May 12, 2008.

Francis A. Miniter, Miniter & Associates, Hartford, CT, for Plaintiff.

Christina L. Feege, Elena Paraskevas–Thadani, Littler Mendelson, New York, NY, for Defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

JANET BOND ARTERTON, District Judge.

In this removed diversity action claiming libel and false light, the defendant moves for summary judgment on both counts based on two affirmative defenses: the truth of the allegedly defamatory statement, and the Connecticut privilege for employment references. For the reasons that follow, the defendant's motion will be granted.

## I. Facts and Background

Drawing all factual inferences in favor of the party opposing the motion and viewing the factual disputes in the light most favorable to that party, see *Phaneuf v. Fraikin,* 448 F.3d 591, 595 (2d Cir.2006), the record reveals the following facts. Defendant

Swift Transportation ("Swift"), an Arizona corporation with its principal place of business in that state, hired Mr. Belanger, a Connecticut citizen, in May 2000 as a truck driver.

On August 25, 2003, Mr. Belanger was driving a Swift tractor trailer on the Cross–Bronx Expressway in New York City. Mr. Belanger's truck was in the center lane, following a sport utility vehicle at a distance of approximately one tractor trailer length, with vehicles in the lanes to his right and left.[1] Another tractor trailer passed Mr. Belanger's truck on the right, swung into the space between Mr. Belanger's truck and the sport utility vehicle, and immediately "locked up his brakes,"[2] resulting in Mr. Belanger's truck colliding with the rear of that truck. Mr. Belanger suffered a concussion,[3] his truck sustained $40,000 in damage and needed a tow from the scene, and the accident was severe enough to require reporting to the United States Department of Transportation.[4]

As a result of this rear-end collision, Mr. Belanger was fired by Swift. Mr. Belanger protested his discharge in telephone calls to two employees in Swift's safety department—one in Syracuse and one in Phoenix—in which he claims to have described the crash circumstances and why, in his view, the crash could not have been prevented by him.[5] Mr. Belanger heard nothing further from Swift following his discharge despite his proffered explanation.

While employed by Swift, Mr. Belanger had been provided with a copy of Swift's driver policy and procedure handbook, which states that

---

**1.** Belanger Dep. (Pl.'s Opp. to Summ. J. [Doc. # 57], Ex. A) at 64:15–20.

**2.** *Id.* at 70:17–19.

**3.** *Id.* at 62:3–5.

**4.** Pl.'s Local R. 56 Stmnt. at ¶ 8.

**5.** Belanger Dep. at 65:17–67:22.

every crash in which a driver is involved shall be considered preventable unless it is established by investigation and review that there was no option which the driver could have reasonably taken to avoid the crash and that his or her action in no way contributed to the occurrence of the crash.[6]

In addition, Swift informed drivers of a policy which enumerated the "Forbidden Five" on-the-job mistakes which would lead to immediate termination, among which was rear-ending another vehicle. Mr. Belanger acknowledges that he was aware of the "Forbidden Five" from a message sent to his truck's data terminal, and was aware that rear-end collisions were employment-terminating events.[7] His suit does not challenge his termination.

At some point following Mr. Belanger's discharge, Swift's claims and safety departments determined that the accident had been preventable,[8] although the record is silent as to any procedure used to investigate the accident or whether any investigation ever took place other than receipt of plaintiff's version of the crash circumstances. As a result of the claims and safety departments' determination, Swift "Investigator II" Angelica Flores recorded Mr. Belanger's discharge on DACS, a subscription-based electronic driving record clearinghouse run by U.S. Investigations Services, Inc. which is used by trucking companies to vet driver job applicants' work histories and safety records. At the time of hire by Swift, Mr. Belanger consented to Swift providing DACS with his employment history with the company, and he raises no issues related to consent in his opposition to summary judgment.[9] Mr. Belanger's DACS record shows the dates of his employ with the defendant, his reason for discharge, and a short description of his work record.[10] The parties agree that DACS permits an employee to add his or her comment about the employer's entry.[11] In the "work record" field, Ms. Flores entered "938," the DACS code for "unsatisfactory safety record."[12] The DACS user manual explains that code 938 should be entered to signify that the driver "did not meet company safety standards."[13] It is this DACS entry that is the basis for plaintiff's libel and false light claims.

A week or two after being terminated by Swift, Mr. Belanger began seeking work with other trucking companies[14] which checked the DACS site or to whom he disclosed the DACS information.[15] Some of these potential employers advised him that his DACS report reflecting an unsatisfactory safety record rendered him an unattractive hire.[16] Mr. Belanger brought suit against Swift in the Connecticut Superior Court, which Swift removed to federal court on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a). Swift now moves for summary judgment on both counts.

6. Pl.'s Opp. to Summ. J. Ex. E [Doc. # 57].

7. Belanger Dep. at 47:3–18, 48:9–49:14.

8. Angelica Flores Aff. [Doc. # 54] at ¶¶ 9–10.

9. Pl.'s Opp. to Summ. J. [Doc. # 57], Ex. F.

10. *See* Angelica Flores Aff., Ex. D [Doc. # 54–5] at Ex. A.

11. Pl.'s Local R. 56 Stmnt. at ¶ 34.

12. *Id.* at ¶¶ 11–12.

13. Angelica Flores Aff., Ex. D [Doc. # 54–5].

14. Belanger Dep. at 80:9–12.

15. Belanger Aff. (Pl.'s Opp. to Summ. J. [Doc. # 62–3]) at ¶ 14.

16. Belanger Aff. [Doc. # 62–3] at ¶¶ 13–14.

## II. Standards

The well-known summary judgment standard is familiar to the Court and will be applied without recitation in detail. *See, e.g., Milardo v. City of Middletown,* 528 F.Supp.2d 41, 44–45 (D.Conn.2007). In Connecticut, the tort of libel is written defamation. *QSP, Inc. v. Aetna Cas. & Sur. Co.,* 256 Conn. 343, 773 A.2d 906, 917 n. 15 (2001). To establish a prima facie case of defamation, a plaintiff must show that: "(1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Hopkins v. O'Connor,* 282 Conn. 821, 925 A.2d 1030, 1042 (2007) (internal citation omitted).

The tort of false light "protects one's interest in not being placed before the public in an objectionable false light or false position, 'or in other words, otherwise than as he is.'" *Goodrich v. Waterbury Republican–American, Inc.,* 188 Conn. 107, 448 A.2d 1317, 1330 (1982) (quoting Restatement (Second) of Torts § 652E cmt. b (1977)). In order to prove a claim of false light, a plaintiff must show that "(a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.*

Swift asserts two defenses to the libel and false light claims. First, the truth of the allegedly libelous DACS statement, which is also claimed to place Mr. Belanger in a false light, "provides an absolute defense" to both torts, *id.* at 1322, 1330–1331. Second, the defendant relies on the qualified privilege which employers enjoy to communicate "the employment references of current or former employers that were solicited with the employee's consent," *Miron v. Univ. of New Haven Police Dep't,* 284 Conn. 35, 931 A.2d 847, 853 (2007), a privilege which defeats liability so long as the employer has not made the statements with actual malice. *Torosyan v. Boehringer Ingelheim Pharmaceuticals,* 234 Conn. 1, 662 A.2d 89, 103 (1995).

The defendant has moved for summary judgment on the grounds that the 938 DACS code recorded in Mr. Belanger's Swift work history reflected a true statement, *i.e.,* that the plaintiff did not meet company safety standards. Swift further argues that its DACS report regarding Mr. Belanger's work history is a privileged employment reference under *Miron.* The plaintiff opposes summary judgment, arguing that the 938 DACS code does not represent the truth because the 2003 accident was in fact unavoidable, and that defendant's report to DACS is not privileged because the defendant's use of the 938 code on his DACS record was based on no investigation, or a highly-ineffective one given the actual circumstances of the collision, thus showing malice on the part of the defendant.

## III. Application of the Qualified Privilege

In opposing summary judgment, Mr. Belanger does not dispute that the qualified privilege protecting "'communications between managers regarding the review of an employee's job performance'" would immunize the defendant from liability under both the libel and false light claims, *Miron,* 931 A.2d at 854 (quoting *Torosyan,* 662 A.2d at 103). Rather, at oral argument, plaintiff's counsel maintained that the *Miron* privilege did not apply to Swift's publication of its reason for terminating Mr. Belanger on DACS, arguing that *Miron* protects only individu-

alized job references tendered directly to a soliciting prospective employer such as by phone, in person, or via correspondence, but does not privilege references made available through DACS and accessed by computer. In the plaintiff's contemplation, clearinghouses such as DACS lie outside of *Miron* because prospective employers accessing such services receive no elaboration of the applicant's work history as they could by questioning the former employer for specifics. In Mr. Belanger's case, plaintiff's counsel hypothesized that a prospective employer speaking by telephone with Swift would be able to receive a fuller explanation of the accident circumstances resulting in his discharge, whereas a prospective employer using DACS sees only that Mr. Belanger's employment with Swift ended because of an "unsatisfactory safety record," without further explanation. Thus, Mr. Belanger urges that *Miron* only protects employee references tendered during direct employer-to-employer contact, and not to postings for an undifferentiated subscriber audience, as on DACS.

■ *Miron* extended the *Torosyan* privilege for intra-corporate communications regarding an employee's performance to include "a qualified privilege for the employment references of current or former employers that were solicited with the employee's consent," *Miron*, 931 A.2d at 853. A concern underlying *Miron* was that the absence of a qualified privilege for employment references made in good faith and without improper motive would "encourage a 'culture of silence'" such that employers would choose to muzzle their views about an employee's performance "rather than rely on truth as a defense to a defamation claim," *id.* at 854 (internal quotation omitted).

Mr. Belanger offers no rationale for the distinction which he draws between a DACS-type employer information clearinghouse and direct employer-to-employer contact addressing the candor concern underlying the *Miron* privilege. Here, employer forthrightness about employee driving records has obvious importance, as evidenced by the federal regulation compelling trucking companies to investigate applicant drivers' safety records before hiring. *See* 49 C.F.R. § 391.23(a)(2) ("[E]ach motor carrier shall make … [a] n investigation of the driver's safety performance history with Department of Transportation regulated employers during the preceding three years"); 49 C.F.R. § 391.23(c)(2) (the inquiry "may consist of personal interviews, telephone interviews, letters, or any other method for investigating that the carrier deems appropriate"). The Court sees no persuasive reason why a trucking employer's information about an employee's employment history and reason for discharge input on consent into a system established to enable other motor carriers to solicit this information online to meet their regulatory duty of inquiry about an applicant's driving record should not enjoy the *Miron* privilege, so long as its entries are not ill-motivated or made for improper purpose.

Plaintiff also draws no meaningful distinction between DACS and other modes for conveying employee references to prospective employers, such as letters, fax, or email. Swift's address and telephone number are listed on DACS, enabling any interested employer to seek further information, just as could be done in follow-up with other forms of written communication, *see* Flores Aff. Ex. C [Doc. # 54–4]. Furthermore, Mr. Belanger offers no evidence from which it could be inferred that Swift would have given to a directly inquiring prospective employer an account of why plaintiff was fired different from that

contained in its record from which the DACS entry was made.

■ At oral argument, plaintiff's counsel also contended that posting employment histories to DACS falls outside of the *Miron* qualified privilege because of the availability of DACS to a wider audience than specific prospective employers. While the Connecticut Supreme Court suggested that a plaintiff could show malice " 'by proving that the defamatory statement had been published *to others not involved in the management or review of employees,*' " it did not limit applicability of the qualified privilege itself on that basis. *Miron,* 931 A.2d at 853 n. 8 (quoting *Torosyan,* 662 A.2d at 89 n. 12) (emphasis added). Mr. Belanger offers no evidence that this defendant unreasonably disseminated Mr. Belanger's adverse work history using DACS, particularly since DACS is consulted by trucking companies to make informed hiring decisions, a purpose which is at the heart of *Miron*'s protections.

## IV. Whether Defendant Acted With Malice

Mr. Belanger argues that even if the DACS driver history published by the defendant is privileged, the defendant's conduct abused the qualified privilege by acting with malice. The evidence of malice Mr. Belanger points to is the fact that the defendant's investigator Ms. Flores never spoke with Mr. Belanger, that the defendant did not give Mr. Belanger "an opportunity to explain what happened", and that the defendant has no written account detailing its investigation. Swift does not dispute Mr. Belanger's factual allegations, but maintains that this evidence does not rise to the level of animus or neglect required to defeat the qualified privilege.

The Connecticut Supreme Court has not decided whether a showing of recklessness may demonstrate actual malice and thus defeat the qualified privilege, *see Torosyan,* 662 A.2d at 104 n. 12; Miron, 931 A.2d at 852 n. 8. However, it has not taken a crabbed view of what constitutes privilege-defeating malice: "For purposes of our law of defamation, malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." *Bleich v. Ortiz,* 196 Conn. 498, 493 A.2d 236, 237 (1985). This focus on motive, which would exclude mere negligence, is consistent with the definition of "recklessness" in *Bishop v. Kelly*: "a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater ... than that which is necessary to make his conduct negligent." 206 Conn. 608, 539 A.2d 108, 111 (1988) (internal quotations omitted).

The case of *Gaudio v. Griffin Health Servs. Corp.,* 249 Conn. 523, 733 A.2d 197 (1999), reflects the breadth of improper motive which could support a finding of malice. There, the plaintiff had been discharged from his position as a hospital security officer after he participated in the seizure and restraint of a volatile psychiatric patient who had broken free from other staff members and was attempting to escape the room in which he was being held. Gaudio assisted in restraining the patient using techniques approved by the defendant's policy manual, but was nevertheless discharged on the recommendation of one of the defendant's vice presidents, whose memorandum recommending Gaudio's discharge "was based almost entirely upon a memo prepared by ... the hospital's security supervisor ... [who], in turn, merely summarized the statements of several purported witnesses, some of whom had allegedly accused the plaintiff of striking the

patient." *Id.* at 202. Gaudio was furnished with a letter advising him of his discharge on grounds that he had "displayed bad judgment and did not follow established procedures regarding restraint of a patient," *id.* The Connecticut Supreme Court affirmed the reasonableness of that jury's verdict that the statements in the letter were "made maliciously or for an improper or unjustifiable motive," *id.* at 204, based on evidence that the defendant's statements about Gaudio conduct were unsupported by any independent inquiry and were motivated instead by the defendant's fear of a lawsuit. *Id.* at 209–210.

■ In contrast with *Gaudio*, the sparse record here contains no evidence capable of showing any improper motive in inputting the DACS data record. Mr. Belanger's evidence that he had received no contact from the defendant in response to his explanation of how the accident occurred provides no basis for a jury to reasonably find "any improper or unjustifiable motive," *Bleich*, 493 A.2d at 237. While much could be hypothesized—defendant did no independent investigation and just rejected plaintiff's explanation of non-preventability; defendant did some sort of investigation and credited its own conclusion; defendant did no investigation and did not consider plaintiff's explanation, *et cetera*—all are rank speculation and none are indicative of any improper motivation. Moreover, unlike *Gaudio*, what Swift did or did not do in its investigation is not suggestive of any false accusation of employee misconduct. Unlike Mr. Gaudio, who was denounced by his employer as having violated hospital policy, Mr. Belanger does not dispute that his driving conduct was strictly prohibited by Swift's policies—a rear-end accident punishable by immediate termination. Rather, Mr. Belanger contests his employer's attribution of some responsibility to him for the prohibited collision. Under such circumstances, the company's adherence to its termination policy for such occurrences is not suggestive of any nefarious motivation.

## V. Conclusion

For the reasons set forth above, the defendant's publication of its reason for terminating Mr. Belanger to DACS was privileged, and lacking any evidence of its abuse of that privilege, Swift's motion for summary judgment [Doc # 53] is GRANTED. The Clerk is directed to close this case.

IT IS SO ORDERED.