### LAURIE GAMBARDELLA *v.* APPLE HEALTH CARE, INC., ET AL.
### (SC 17977)

Rogers, C. J., and Norcott, Katz, Palmer and Sullivan, Js.

Argued February 13—officially released May 19, 2009

*Brendon P. Levesque*, with whom were *Karen L. Dowd* and, on the brief, *Wesley W. Horton, Michael S. Taylor* and *Dana M. Hrelic*, certified legal intern, for the appellants (defendants).

*Stephen E. Pliakas*, with whom were *Robert Nastri, Jr.*, and, on the brief, *Jeffrey J. Tinley*, for the appellee (plaintiff).

*Opinion*

KATZ, J. The plaintiff, Laurie Gambardella, filed a defamation action against the defendants, Apple Health Care, Inc. (Apple), Waterbury Extended Care Facility, Inc. (facility), and facility administrator John Sweeney, alleging that they had communicated false accusations of theft to others in connection with their termination of her employment. The case was tried to the court, *Gallagher, J.*, which rendered judgment in favor of the plaintiff. The defendants appealed from the judgment of the trial court,[1] claiming that the court improperly had rejected their defense of the qualified privilege for intracorporate communications because it failed to apply an actual malice standard when determining that the defendants had lost the privilege and because there was insufficient evidence to support a finding of actual malice. We conclude that the trial court applied an actual malice standard and that its decision is supported by the record. Accordingly, we affirm the judgment of the trial court.

The record discloses the following undisputed facts and procedural history relevant to this appeal. The plaintiff was employed by the facility, which is owned and operated by Apple, as an admissions counselor from September, 1998, until her discharge on May 25, 2000. In the course of her employment, the plaintiff met

---

[1] The defendants appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

with Eleanore O'Sullivan concerning the admission of O'Sullivan's aunt, Fannie Lauro, to the facility. Upon Lauro's admission to the facility on May 12, 2000, O'Sullivan brought a number of items of Lauro's personal property, including clothing and furniture, to the facility for Lauro's use. Days later, Lauro suffered a massive heart attack. She died at Waterbury Hospital on May 15, 2000.

O'Sullivan subsequently went to the facility to retrieve some articles of clothing for Lauro's funeral, and she and the plaintiff discussed the disposition of Lauro's personal property remaining at the facility. O'Sullivan told the plaintiff that she was not interested in the property and that the plaintiff should do whatever she wanted with the items. The plaintiff decided to keep two chairs for herself. On the evening of May 18, 2000, the plaintiff contacted Colleen Busk, the nursing supervisor on duty at the facility, to inform Busk that the plaintiff's son and a friend would be coming to take the chairs from Lauro's room. Busk asked if she could have the dresser from the room. The plaintiff agreed, and Busk removed the dresser. The plaintiff later informed Joseph Stolfi, the facility's maintenance supervisor, that the remaining furniture was available for use elsewhere in the facility. Stolfi asked about the chairs and the dresser, and the plaintiff informed him that those items had been taken care of already. Thereafter, Stolfi contacted Sweeney to apprise him of the situation.

Sweeney decided to conduct an investigation into the disposition of the property. He spoke with the plaintiff, who explained that O'Sullivan had given her the furniture and that she had taken some of it to her home and had given some of it to Busk. Sweeney informed her that there was a corporate policy against accepting gifts

from residents and their families.[2] The plaintiff was not aware of the policy, but after being informed of it, she subsequently returned the chairs to the facility. Sweeney directed Kathy Breidenbach, a social worker at the facility, to contact O'Sullivan to ascertain her wishes with respect to the property. O'Sullivan confirmed the plaintiff's account to Breidenbach, and Breidenbach informed Sweeney, providing him with handwritten notes of the conversation. Sweeney then contacted O'Sullivan directly, who verified that she had given the furniture to the plaintiff to keep or give to others as she saw fit. O'Sullivan subsequently sent a letter to the plaintiff in which she stated that the property had been left for the plaintiff to keep for herself or distribute to others in her sole discretion.[3] Sweeney received a copy of this letter.

Despite the results of this investigation, Sweeney decided that the plaintiff had stolen the furniture. He concluded that, because company policy barred employees from accepting gifts from residents or their families, the furniture belonged to the facility. Therefore, he determined that, when the plaintiff removed the furniture from the facility, she had committed theft. He forwarded the results of his investigation, except

---

[2] The defendants introduced into evidence a copy of this policy from an employee handbook dated 1993. Sweeney testified that this policy was in effect at the time of the plaintiff's employment. The trial court described the policy as follows: "The employee handbook of [the facility] lists '[s]oliciting or accepting tips/gratuities from residents/families/visitors/suppliers or vendors' as a moderately severe infraction for which a first time violation would result in a three day suspension and a ninety day probation. 'Stealing' is a severe infraction requiring termination after a period of suspension during which time the facility will conduct its investigation."

[3] The letter from O'Sullivan to the plaintiff was introduced into evidence and provides in relevant part: "This letter is to clarify our verbal instructions regarding the disposition of the property of [Lauro] . . . . The property consisting of clothing, recliner chair, dresser, lamp table and small arm chair, is left there *for you* to distribute to yourself, your fellow staff members or patients, at your sole discretion. . . ." (Emphasis added.)

for the substance of his own conversation with O'Sullivan, to Jack Boynton, director of human resources for Apple, and recommended that the plaintiff's employment be terminated for theft. After reviewing the information provided to him, Boynton approved the termination.

Sweeney thereafter scheduled a meeting between himself and the plaintiff to inform her that her employment was being terminated. In accordance with Apple's corporate policy requiring the presence of a witness at termination meetings, Sweeney asked Kate Sloan, director of admissions and marketing for Apple, to be present. At the meeting, Sweeney presented the plaintiff with a disciplinary action report indicating that her employment was being terminated and explained that she was being fired for theft because she had taken the chairs, which belonged to the facility, from Lauro's room.

Other individuals subsequently learned the reason for the plaintiff's employment termination. Busk had heard some facility employees discussing the fact that the plaintiff had been fired for taking furniture. Other people, including the plaintiff's daughter, also had heard that the plaintiff had been fired for "taking furniture from a dead lady . . . ."

Thereafter, the plaintiff brought an action for defamation against the defendants.[4] In response, the defendants contended that any defamatory statement that may have been made was protected by a qualified privi-

---

[4] Initially, the plaintiff also had alleged wrongful termination and breach of the implied warranty of good faith and fair dealing. The trial court, *Pittman, J.*, granted the defendants' motion to dismiss the complaint and rendered judgment thereon. The plaintiff appealed from the judgment of the trial court to the Appellate Court, and the Appellate Court reversed the judgment of dismissal as to the defamation counts, remanding for a new trial only on those counts. *Gambardella* v. *Apple Health Care, Inc.*, 86 Conn. App. 842, 854, 863 A.2d 735 (2005).

lege for intracorporate communications regarding an employee's termination.

Following a trial to the court, Judge Gallagher issued two decisions, the first of which found the defendants liable for defamation, and the second of which awarded general, special and punitive damages for a total of $224,481 in damages, plus costs, to the plaintiff. The court concluded that the plaintiff had established that O'Sullivan had given the furniture to her, and that the defendants had published false allegations of theft to third parties, which constituted defamation per se. The trial court rejected the defendants' claim that such communications were protected by the qualified privilege for intracorporate communications because, as a result of Sweeney's investigation, the defendants undoubtedly had known that the allegation of theft was false. It also found that the defendants' insistence that the plaintiff had committed theft, despite Sweeney's investigation, was further evidence of their bad faith. The trial court thereafter rendered judgment in favor of the plaintiff, and this appeal followed. See footnote 1 of this opinion. Additional facts will be set forth as necessary.

On appeal, the defendants claim that the trial court improperly determined that the qualified privilege for intracorporate communications had been abused and therefore lost. Specifically, they contend that, although Connecticut courts have recognized that a qualified privilege may be defeated by a showing of either actual malice, i.e., publication of a statement with knowledge of the statement's falsity or reckless disregard for its truth, or malice in fact, i.e., publication of a false statement with bad faith or improper motive, this case law overall has been inconsistent and this court specifically has left open the question of which standard should be applied to defeat the qualified privilege for intracorporate communications. They assert that the purpose underlying this privilege is of sufficient importance that

this court should require the more stringent showing of actual malice, rather than malice in fact, to defeat the qualified privilege. The defendants further claim that there was insufficient evidence in the present case to show either actual malice or bad faith.[5]

In response, the plaintiff contends that the settled law in Connecticut permits a showing of either actual malice or malice in fact to defeat the qualified privilege for intracorporate communications in a defamation case brought by a person who is not a public figure. She also claims that the trial court properly found, and the evidence supports, that the false statements had been published both with actual malice and malice in fact.[6] We agree with the plaintiff.

We begin our analysis by setting forth the relevant legal principles and the proper standard for our review. "A defamatory statement is defined as a communication that tends to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him . . . . To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defama-

---

[5] Because we conclude that actual malice was the standard employed by the trial court and that the evidence was sufficient to support its finding of actual malice, we need go no further in our analysis. See *Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 30 n.12, 662 A.2d 89 (1995) (declining to engage in further analysis upon concluding that evidence supported finding of actual malice).

[6] The plaintiff also asserts, as an alternate ground for affirmance, that the defendants exceeded the scope of the qualified privilege for intracorporate communications because the defamatory statements had been published beyond the group to whom the privilege had attached, namely, those not directly involved in the decision to terminate the plaintiff's employment. In light of our conclusion that the trial court properly determined that the qualified privilege had been abused because the evidence presented established actual malice, we need not reach this claim or, in turn, the defendants' contention that the record lacks the necessary findings to review this claim.

tory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." (Citations omitted; internal quotation marks omitted.) *Cweklinsky* v. *Mobil Chemical Co.*, 267 Conn. 210, 217, 837 A.2d 759 (2004). If the plaintiff is a public figure, however, the plaintiff also must prove that the defamatory statement was made with actual malice, such that "the statement, when made, [was] made with actual knowledge that it was false or with reckless disregard of whether it was false." (Internal quotation marks omitted.) *Woodcock* v. *Journal Publishing Co.*, 230 Conn. 525, 535, 646 A.2d 92 (1994), cert. denied, 513 U.S. 1149, 115 S. Ct. 1098, 130 L. Ed. 2d 1066 (1995), citing *New York Times Co.* v. *Sullivan*, 376 U.S. 254, 279–80, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964). Additionally, to recover punitive damages, a plaintiff must prove actual malice, regardless of whether the plaintiff is a public figure. See *Triangle Sheet Metal Works, Inc.* v. *Silver*, 154 Conn. 116, 127, 222 A.2d 220 (1966); *Proto* v. *Bridgeport Herald Corp.*, 136 Conn. 557, 571, 72 A.2d 820 (1950).

A defendant may shield himself from liability for defamation by asserting the defense that the communication is protected by a qualified privilege. *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1, 27, 662 A.2d 89 (1995). When considering whether a qualified privilege protects a defendant in a defamation case, the court must resolve two inquiries. *Charles Parker Co.* v. *Silver City Crystal Co.*, 142 Conn. 605, 616, 115 A.2d 440 (1955). The first is whether the privilege applies, which is a question of law over which our review is plenary. *Miron* v. *University of New Haven Police Dept.*, 284 Conn. 35, 43, 931 A.2d 847 (2007). The second is whether the applicable privilege nevertheless has been defeated through its abuse, which is a question of fact. *Bleich* v. *Ortiz*, 196 Conn. 498, 501, 493 A.2d 236 (1985). In a defamation case brought by an individ-

ual who is not a public figure, the factual findings under-pinning a trial court's decision will be disturbed only when those findings are clearly erroneous, such that there is no evidence in the record to support them. See id.; but see *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 535–36 (holding that, in appeal of defamation case brought by public figure, clear and convincing evidence standard of review applies, rather than clearly erroneous standard of review). Finally, to the extent that a litigant challenges the legal standard that is required to establish that a privilege has been defeated, that issue is a question of law over which our review is plenary. *Location Realty, Inc.* v. *Colaccino*, 287 Conn. 706, 717, 949 A.2d 1189 (2008); id. ("[t]o the extent that we are required to review conclusions of law . . . by the trial court, we engage in plenary review"); *Hartford Courant Co.* v. *Freedom of Information Commission*, 261 Conn. 86, 96–97, 801 A.2d 759 (2002) (noting that plenary review is required when determining whether correct legal standard was applied).

I

We first consider the defendants' claim that the legal standard to overcome the qualified privilege for intra-corporate communications with respect to employment decisions was left open by this court in *Miron* v. *University of New Haven Police Dept.*, supra, 284 Conn. 42–43 n.8, and *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 30 n.12, and that this court should require a showing of actual malice to defeat this privilege. The crux of the defendants' claim is that the purpose underlying the privilege, namely, to encourage the free flow of information necessary for efficient, intelligent employment decisions, is hindered only if the speaker acts with actual malice because only false information, not mere bad faith, impedes the free flow of information necessary for employment deci-sions. Consequently, the defendants contend, actual

malice should be the standard to defeat the qualified privilege in the context of intracorporate communications with respect to employment decisions. We are not persuaded.

In *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29, this court first recognized a qualified privilege for intracorporate communications in the context of employment decisions. Under this rule, "communications between managers regarding the review of an employee's job performance and the preparation of documents regarding an employee's termination are protected by a qualified privilege. Such communications and documents are necessary to effectuate the interests of the employer in efficiently managing its business." Id.; accord *Miron* v. *University of New Haven Police Dept.*, supra, 284 Conn. 45.

As a general matter, a qualified privilege in a defamation case may be defeated if it can be established that the holder of the privilege acted with malice in publishing the defamatory material. *Hopkins* v. *O'Connor*, 282 Conn. 821, 845, 925 A.2d 1030 (2007); accord *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 545, 733 A.2d 197 (1999). This court has held that "malice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." *Bleich* v. *Ortiz*, supra, 196 Conn. 504; accord *Gallo* v. *Barile*, 284 Conn. 459, 463–64 n.6, 935 A.2d 103 (2007). Consistent with this broad view, for more than 100 years, this court has concluded that a qualified privilege is lost upon a showing of *either* actual malice, i.e., publication of a false statement with actual knowledge of its falsity or reckless disregard for its truth, *or* malice in fact, i.e., publication of a false statement with bad faith or improper motive. See, e.g., *Atwater* v. *Morning News Co.*, 67 Conn. 504, 514, 516, 34 A. 865 (1896) (qualified privilege lost either if statement not made in good faith or if made recklessly or "inconsistent with

any honest interpretation of the facts and the language used"); *Hassett* v. *Carroll,* 85 Conn. 23, 35–36, 81 A.1013 (1911) (stating that "express malice" is sufficient to defeat privilege but finding malice in fact because defendant published defamatory material with "improper and unjustifiable motives"); *Ely* v. *Mason,* 97 Conn. 38, 44, 115 A. 479 (1921) (explaining "[a]s the defamatory statements were made on an occasion of privilege, the burden rested upon the plaintiff to prove *actual malice or malice in fact,* in order to recover" [emphasis added]); *Charles Parker Co.* v. *Silver City Crystal Co.,* supra, 142 Conn. 615–18 (noting that plaintiff had not shown either knowledge of falsehood, reckless disregard for truth or other forms of bad faith and, therefore, defendant was protected by qualified privilege); *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.,* supra, 234 Conn. 28–30 (stating that privilege may be defeated by malice in fact but concluding that trial court implicitly found actual malice); *Gaudio* v. *Griffin Health Services Corp.,* supra, 545–46 (discussing malice in terms of both actual malice and malice in fact and concluding that statements had been made "maliciously or for an improper or unjustifiable motive" [internal quotation marks omitted]). Indeed, in a relatively recent case, this court explicitly stated that a showing of either actual malice or malice in fact suffices to defeat a qualified privilege in defamation cases, without ever suggesting that the standard may differ for certain qualified privileges. *Hopkins* v. *O'Connor,* supra, 845 ("[w]e previously have held that the malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice"); accord *Gallo* v. *Barile,* supra, 463 n.6 ("the malice required to overcome a qualified privilege in defamation cases is malice in fact or actual malice" [internal quotation marks omitted]).

Despite this long history, the defendants suggest that the law is not as well settled in this context and point

to footnotes in two cases in which this court has used language suggesting that we had not yet decided whether to apply the actual malice standard to cases involving the qualified privilege for intracorporate communications made in connection with employment decisions. Specifically, they cite a footnote in *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 30 n.12, in which we first recognized a qualified privilege for intracorporate communications, and a footnote in *Miron* v. *University of New Haven Police Dept.*, supra, 284 Conn. 42–43 n.8, quoting *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 30 n.12, in which we later considered the scope of that privilege.[7] Although we acknowledge that these footnotes may be interpreted consistently with the defendants' contentions, we reject this interpretation for several reasons. First, these statements are merely dicta, as the issue of the proper legal standard required to defeat this qualified privilege was not before this court in those cases. Second, although the defendants contend that the policy reasons underlying the privilege for intracorporate communications are significant

---

[7] In *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 30–31 n.12, and later in *Miron* v. *University of New Haven Police Dept.*, supra, 284 Conn. 42–43 n.8, this court stated: "Because the plaintiff's evidence satisfied the actual malice test described in *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 527, we need not decide whether, in a defamation action such as this one, a plaintiff could prove actual malice to defeat the qualified privilege on some lesser showing of recklessness. . . . We also need not decide whether a plaintiff alleging defamation could overcome the qualified privilege without proving actual malice, by proving a lack of good faith on the part of the employer. Compare *Bleich* v. *Ortiz*, supra, 196 Conn. 504 (qualified privilege may be overcome on finding of bad faith or improper motive), *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 615 (qualified privilege may be overcome on finding of bad faith), and *Miles* v. *Perry*, [11 Conn. App. 584, 594–95 and 595 n.8, 529 A.2d 199 (1987)], [with] 3 Restatement (Second), Torts § 600 (1977) (lack of good faith insufficient to defeat privilege; statement must be made with actual knowledge of falsity or reckless disregard as to truth) . . . ." (Citations omitted.)

enough to warrant a showing of actual malice, they have not pointed to any reason why the policy reasons in this context are more noteworthy than or distinguishable from the rationale underlying any other qualified privilege such that this qualified privilege alone warrants the showing of actual malice. Third, nothing in our jurisprudence suggests that we would be inclined to adopt the standard of actual malice from the Restatement (Second) of Torts, cited in these two footnotes; see footnote 7 of this opinion; with respect to the qualified privilege for intracorporate communications concerning employment decisions. To the contrary, as we previously have noted, our jurisprudence consistently has deemed either actual malice or malice in fact sufficient to overcome qualified privileges. Indeed, our precedents, including those cited in the *Torosyan* footnote, expressly have found malice in fact when holding that qualified privileges had been overcome. See, e.g., *Gaudio* v. *Griffin Health Services Corp.*, supra, 249 Conn. 545–46; *Bleich* v. *Ortiz*, supra, 196 Conn. 504; *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 615–16; *Hassett* v. *Carroll*, supra, 85 Conn. 35–36.

We acknowledge that our cases have not used the *labels* "actual malice" and "malice in fact" consistently, and this may have given rise to some confusion. Indeed, as the United States Supreme Court has stated, the use of the term "malice" may itself be susceptible to confusion, as it also may be used, in common speech, to denote "evil intent or a motive arising from spite or ill will." *Masson* v. *New Yorker Magazine, Inc.*, 501 U.S. 496, 510, 111 S. Ct. 2419, 115 L. Ed. 2d 447 (1991). Moreover, public figure cases may confuse the issue, as they require actual malice as part of the plaintiff's case. See, e.g., *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 279–80. Nevertheless, our cases consistently have used descriptive terms to signify "actual malice," namely, the publication of a false statement with actual

knowledge of its falsity or reckless disregard for its truth, or "malice in fact," namely, the publication of a false statement with bad faith or improper motive, and the cases consistently have permitted either showing to defeat a claim of qualified privilege. To the extent that further clarification is needed as to the meaning of these terms, we define actual malice as the publication of a false statement with knowledge of its falsity or reckless disregard for its truth, and malice in fact as the publication of a false statement with bad faith or improper motive.

Therefore, it is clear that the settled law in Connecticut is that a showing of either actual malice or malice in fact will defeat a defense of qualified privilege in the context of employment decisions. The defendants have provided no compelling reason to depart from our well established jurisprudence and require a showing of actual malice exclusively simply because the qualified privilege arises in the context of intracorporate communications in connection with employment decisions. Accordingly, we reject the defendants' invitation to do so.

## II

The defendants also claim that the trial court improperly concluded that the defendants had abused the qualified privilege and, therefore, had lost it when they published defamatory statements about the plaintiff. Specifically, they contend that the trial court's decisions were unclear both as to which legal standard the court had applied and whether the court in fact had found actual malice because, although the court stated in its decision on damages that the evidence had established actual malice, in its earlier decision on liability, the court expressly had stated only that the defendants had acted with bad faith. They also claim that the evidence was insufficient to support a finding of actual malice

because: (1) knowledge of falsity must be evaluated by examining whether the defendants believed their statements were true and, throughout the proceedings, the defendants continued to assert that they believed the allegations of theft were true; and (2) the defendants reasonably had believed that, in light of Apple's policy barring employees from accepting gifts from residents or their families, the plaintiff had committed theft by taking property that did not belong to her.

The plaintiff claims that when the liability and damages decisions are read together contextually, it is apparent that the trial court clearly found that the defendants had acted both in bad faith and with actual malice. She further contends that the trial court properly determined the issue of whether the defendants knew that their statements were false and that there was sufficient evidence to support the court's finding of actual malice. We agree with the plaintiff that the decisions must be read together and that the trial court properly found actual malice.

The record reveals the following additional facts that are relevant to the disposition of this issue. In its decision in favor of the plaintiff on the liability issue, the trial court made a number of factual findings and conclusions of law. It first found that, "[a]s a result of the notes of communications with [O'Sullivan] and his own conversation with her, [Sweeney] knew that [O'Sullivan] intended to give [Lauro's] items to [the plaintiff] to either keep for herself or distribute to others." With respect to the defendants' policy, the trial court specifically pointed to the fact that the employee handbook enumerated two separate offenses, one barring acceptance of gratuities from residents and their families, which could lead to suspension, and another for stealing, which requires termination. See footnote 2 of this opinion. The court noted that Busk, who also had taken furniture, was not fired. The court concluded that the

defendants' statement that the plaintiff had committed theft was false and defamatory per se, noting that "[i]t defies all common sense and credulity to say that, regardless of the wishes of the O'Sullivan family, the furniture belonged only to [the facility]." The court also concluded that the defendants had not acted in good faith and that statements by Sweeney and Boynton that the plaintiff had committed theft were "further evidence of bad faith because that conclusion is contrary to any reasonable construction." Having determined that the qualified privilege had been abused, the trial court held that the defendants were liable for defamation. In its subsequent decision awarding damages, the trial court referenced its earlier decision as to liability, summarizing its holding by stating: "[T]he evidence clearly established that the plaintiff was falsely accused of theft and that the defendants made and published the false statement with actual malice." The court reiterated this finding in its analysis of the issue of punitive damages, noting that such damages are only appropriate when actual malice has been established.

We conclude that, contrary to the defendants' interpretation, the two decisions are not independent of each other but must be read together, contextually, to support the judgment, rather than dissected piecemeal. Cf. *Maguire* v. *Maguire*, 222 Conn. 32, 45, 608 A.2d 79 (1992) (reading memorandum of decision together with order of court to determine meaning); *Saunders* v. *New England Collapsible Tube Co.*, 95 Conn. 40, 42, 110 A. 538 (1920) (reading finding of workers' compensation commissioner together with memorandum of decision to support ultimate determination of fact). When the decisions thus are read together, it is apparent that the trial court intended to find and did find actual malice. The dispositive question in making such a finding is whether the defendants made the communications with knowledge of their falsity or reckless disregard for their

truth, and when the trial court's decision so indicates, we will not disregard its meaning simply for want of a particular phrase. The trial court found that the defendants knew that the accusation of theft was false and that the defendants had acted in bad faith. The failure of the trial court to invoke the talismanic phrase "actual malice" in its liability decision does not invalidate its later express finding of actual malice in the damages decision. To hold otherwise would be to elevate form over substance, a practice that we long have eschewed. See, e.g., *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29–30 (inferring actual malice when defendant intentionally made statement with improper motives and failed to investigate or retract statement after being notified that it was false). Moreover, the defendants' emphasis on the trial court's references to bad faith overlooks the fact that case law establishes that the greater the evidence of bad faith or improper motives, the more likely it is that the publication was made with reckless disregard for its falsity. See *Holbrook* v. *Casazza*, 204 Conn. 336, 346–47, 528 A.2d 774 (1987) (evidence of bad faith may support inference of knowledge or reckless disregard of truth), cert. denied, 484 U.S. 1006, 108 S. Ct. 699, 98 L. Ed. 2d 651 (1988). We therefore conclude that the trial court based its decision on a finding of actual malice and, accordingly, we turn to the defendants' claim that the evidence was insufficient to support that finding.

As we previously have noted, actual malice requires a showing that a statement was made with knowledge that it was false or with reckless disregard for its truth. *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 535, citing *New York Times Co.* v. *Sullivan*, supra, 376 U.S. 279–80. "A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth." (Internal quotation marks omitted.) *Hopkins* v. *O'Connor*, supra, 282 Conn. 846. "Fur-

ther, proof that a defamatory falsehood has been uttered 'with bad or corrupt motive' or with an intent to inflict harm will not be sufficient to support a finding of actual malice; *Beckley Newspapers [Corp.]* v. *Hanks,* [389 U.S. 81, 81–82, 88 S. Ct. 197, 19 L. Ed. 2d 248 (1967)]; *Henry* v. *Collins,* 380 U.S. 356, 357, 85 S. Ct. 992, 13 L. Ed. 2d 892 (1965); although such evidence may assist in drawing an inference of knowledge or reckless disregard of falsity." *Holbrook* v. *Casazza,* supra, 204 Conn. 346–47.

Whether a defendant has knowledge of the falsity of a defamatory statement is a question within the province of the trier of fact. *Bleich* v. *Ortiz,* supra, 196 Conn. 501; see *Holbrook* v. *Casazza,* supra, 204 Conn. 345 (examining jury findings of falsity). The proper inquiry is whether a defendant believes, honestly and in good faith, in the truth of his statements and whether he has grounds for such belief. *Charles Parker Co.* v. *Silver City Crystal Co.,* supra, 142 Conn. 618. Notably, however, a trial court is not required merely to accept a defendant's self-serving assertion that he published a defamatory statement without knowing that it was false. See *Holbrook* v. *Casazza,* supra, 349–50 (inferring that defendants knew of probable falsity of statements, despite professed belief that statements were true); accord *St. Amant* v. *Thompson,* 390 U.S. 727, 731–32, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968). As the United States Supreme Court aptly stated: "The defendant in a defamation action . . . cannot . . . automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. *Nor will they be likely to*

*prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation.*" (Emphasis added.) *St. Amant* v. *Thompson*, supra, 732.

Although whether a defendant has published a false statement with reckless disregard for its truth is not easily captured in a simple definition, we have held that reckless disregard may be found when an individual publishes defamatory statements "with a high degree of awareness of . . . probable falsity . . . or . . . entertained serious doubts as to the truth of [the] publication . . . ." (Citations omitted; internal quotation marks omitted.) *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 540, quoting *Harte-Hanks Communications, Inc.* v. *Connaughton*, 491 U.S. 657, 667, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989); accord *Moriarty* v. *Lippe*, 162 Conn. 371, 380, 294 A.2d 326 (1972). Moreover, "[a] refusal to retract a statement that has been demonstrated to be false and defamatory might be relevant in showing recklessness at the time the statement was published." (Internal quotation marks omitted.) *Holbrook* v. *Casazza*, supra, 204 Conn. 349.

With these principles in mind, we conclude that the trial court's finding that the defendants acted with actual malice in publishing the defamatory statement was supported by the evidence and, therefore, was not clearly erroneous. The evidence, including Sweeney's testimony and verification by another facility employee, overwhelmingly established that O'Sullivan had given the property to the plaintiff "to distribute to [herself or others] . . . at [her] sole discretion" and that this intent had been conveyed to Sweeney both directly and indirectly. See footnote 3 of this opinion. Sweeney admitted to having been informed directly by O'Sullivan, the presumptive owner of the property, of her intent to give the plaintiff—not the facility—the furniture. There was, therefore, no dispute that the owner

of the property had intended to effectuate a gift to the plaintiff, conveying the property to her. Indeed, by virtue of O'Sullivan's gift, the only property that "belonged" to the facility were those items that the plaintiff had declined to take for herself or others and that the plaintiff had given to Stolfi for distribution throughout the facility.

In light of this evidence, there simply was no basis for a belief that the plaintiff had stolen property from the facility. The fact that the defendants had instituted a policy prohibiting employees from accepting gifts from residents or their families as a condition of their employment was relevant only to the plaintiff's employment obligations, not to the ownership of the property. In other words, whatever belief Sweeney may have harbored with respect to the policy prohibiting gifts to employees, that belief did not alter the ownership of the property and cannot alter the meaning of theft, a criminal act defined by law. See General Statutes § 53a-119.[8] Indeed, the facts that the defendants' employee handbook lists theft and the taking of gifts as distinct offenses and that Busk was not fired for doing essentially what the plaintiff had done further would have supported the trial court's rejection of the defendants' professed belief that, under their policy, the plaintiff had committed theft. The groundless nature of the statement accusing the plaintiff of theft sufficiently established that the defendants held a "high degree of awareness of . . . probable falsity" of the statements; (internal quotation marks omitted) *Woodcock* v. *Journal Publishing Co.*, supra, 230 Conn. 540; regardless of whether they denied "entertaining serious doubts" as to their truth. (Internal quotation marks omitted.) Id.;

[8] General Statutes § 53a-119 defines the crime of larceny and provides in relevant part: "A person commits larceny when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from an owner. . . ."

see *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 618. Moreover, Sweeney continued to profess this belief in the face of its demonstrated falsity. Adhering to a demonstrably false and groundless belief and publishing that belief is, purely and simply, reckless disregard for the truth. *Holbrook* v. *Casazza*, supra, 204 Conn. 348–49; *St. Amant* v. *Thompson*, supra, 390 U.S. 732; see also *Torosyan* v. *Boehringer Ingelheim Pharmaceuticals, Inc.*, supra, 234 Conn. 29–30 (inferring actual malice when defendant intentionally made statement with improper motives and failed to investigate or retract statement after being notified it was false).

Finally, contrary to the defendants' contention, the mere fact that the trial court stated that the defendants' professed belief that the plaintiff had stolen the furniture was "contrary to any reasonable construction" does not indicate that the court had imposed an improper standard in determining that the defendants knew the statements were false.[9] The fact that the defendants continued to assert that they believed that the plaintiff had stolen the furniture was not dispositive of the issue of whether they had known that their statements were false or recklessly disregarded their truth. A trial court must evaluate a defendant's testimony, including whether there are grounds to support it, and is

[9] We note that the defendants frame their claim in terms of whether the trial court improperly applied an objective, rather than a subjective, test to determine whether the defendants knew that their statements were false. In essence, the defendants appear to claim that the trial court should have accepted their representations that they believed the statements were true, despite overwhelming evidence to the contrary. We note, however, that we never have applied the labels "subjective" or "objective" when evaluating knowledge of falsity or reckless disregard for the truth, and our case law expressly directs us to consider whether a defendant, in professing a belief that his statements were true, has grounds for his belief. See *Charles Parker Co.* v. *Silver City Crystal Co.*, supra, 142 Conn. 618. As we previously have noted, a trial court is not required merely to accept a defendant's self-serving assertion that he believed his statements were true. *Holbrook* v. *Casazza*, supra, 204 Conn. 349–50.

not constrained simply to accept a defendant's assertion that he did not know that his statement was false. See *Holbrook* v. *Casazza*, supra, 204 Conn. 349–50. The court was not required to, and plainly did not, credit the defendants' testimony. See *Burton* v. *Mottolese*, 267 Conn. 1, 40, 835 A.2d 998 (2003), cert. denied, 541 U.S. 1073, 124 S. Ct. 2422, 158 L. Ed. 2d 983 (2004). It is axiomatic that a defendant who closes his eyes to the facts before him cannot insulate himself from a defamation charge merely by claiming that he believed his unlikely statement. We conclude that there was sufficient evidence to support the trial court's finding of actual malice.

The judgment is affirmed.

In this opinion the other justices concurred.